

FILED
CLERK, U.S. DISTRICT COURT

AUGUST 7, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY
YS

No. 2:23-cv-06281-CBM-SK

# United States District Court for the Central District of California

---

THE EXCELLENT THE EXCELLENT RAJ K. PATEL,
from all capacities,

*Plaintiff*

v.

THE UNITED STATES,

*Defendant.*

---

### NEW CIVIL ACTION

---

### *PRO SE* EMERGENCY AMENDED (SECOND) PETITION FOR A WRIT OF MANDAMUS
### 28 U.S.C. § 1361
### 28 U.S.C. § 1651

T.E., T.E. Mr. Raj K. Patel (Rama CCCX), AA, BA (*pro se*)
The Basis of the United States
Indiana | Georgia | New Jersey
6850 East 21st Street
Indianapolis, IN 46219
Marion County
rajp2010@gmail.com
www.rajpatel.live
+1-317-450-6651

August 7, 2023

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE EXCELLENT THE EXCELLENT RAJ K. PATEL, from all capacities,<br><br>*Plaintiff*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant* | No. 2:23-cv-06281-CBM-SK<br><br>Dated: August 7, 2023<br><br>JURY TRIAL DEMANDED |

### *PRO SE* EMERGENCY AMENDED (SECOND) PETITION FOR A WRIT OF MANDAMUS

I, T.E., T.E. Mr. Raj K. Patel (*pro se*), AA, BA (Rama CCCX), respectfully move this United States District Court for the Central District of California to issue a writ of mandamus to return the protection, Privilege, of the United States back to the Plaintiff, in reconsideration of its order.  28 U.S.C. §§ 1361 & 1651.  Plaintiff need not sue a particular officer because the Defendant will handle the matter under its "presumption of [internal] procedural regularity," Gonzales v. United States, 348 U.S. 407, 412 (1955) ("underlying concepts of procedural regularity and basic fair play"), that is to the say the "[C]hief [C]onstitutional [O]fficer [(the President who is Commander-in-Chief of the Armed and Space Forces)]" will delegate it to "Inferior Officers...or in the Heads of Departments," which the Secretary of State is both.  U.S. const. art. II, § 2, cl. 2.  Nixon v. Fitzgerald, 457 U.S. 731, 750, 789, 794 (1982) (the President is the Chief Administrative Officer of the U.S.A. as are C.E.O.'s and other Chief Executives) and see generally United States v. Arthrex, Inc., 141 S. Ct. 1970, 2007-09 (2021) (*dicta* on inferior officers or heads of departments).  Cain v. United States, 73 F. Supp. 1019, 1021 (N.D. Ill. 1947).  Along with the

President of the United States, this court, and Patel are Protectors of the Faith.  U.S. const. art. IV, § 1.

The duty to monitor status of the State (permitted force holders without a license[1], Seat officials, Basis officials, ranking military, sister state officials, etc.) and the duty protect its actors has been reverted to the Oval Office from the initial Department of State, the one the Father of the Constitution, James Madison, served as Secretary (an officer of the United States) before becoming President.  Marbury v. Madison, 5 U.S. 137, 163 (1803). Poindexter v. Greenhow, 114 U.S. 270, 290 (1885).  Federalist Nos. 42 & 80.  U.S. const. amend. XIV, § 1.  U.S. const. art. IV, § 2.  Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority); United Nations Convention on the Rts. of the Child, Pt. 1, arts. 16 & 27(1) (effective 1995) (kid's own status) (mandatory executive agreement); Convention Against Torture & Other Cruel, Inhuman or Degrading Treatment or Punishment (effective 1966) (mandatory authority); Int'l Convention on the Elimination of All Forms of Racial Discrimination (effective 1994) (mandatory authority); and Int'l Covenant on Econ., Soc. & Cultural Rts. (effective 1977) (mandatory executive agreement).  See *infra*, pp. 16-7.  **Arthrex, Inc., 141 S. Ct. at 1979 & 1982 ("Today, thousands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through "a clear and effective chain of command" down from the President, on whom all the people vote....James Madison extolled this "great principle of unity and responsibility in the Executive department," which ensures that "the chain of dependence [will] be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong. 499**

---

[1] Printz v. United States, 521 U.S. 898, 918 (1997) quoting Principality of Monaco v. Mississippi, 292 U.S. 313, 322 (1934).

(1789).").  Nevertheless, it is likely that this responsibility is unchecked and many lay-ers beneath the President, ripe for mandamus by the court.  Arthrex, Inc., 141 S. Ct. at 1983 & 1988.

## WELL-PLEADED COMPLAINT STANDARDS

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007).  "Pleadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).

## THE RELIEF SOUGHT

Grant mandamus to the Presidency or the Executive Branch to terminate the inter-vening causes.

Grant mandamus even if the court thinks that its order will not be enforced so that licenses and other persons have cause to effectuate the mandamus.

## THE ISSUES PRESENTED

I.     Is Plaintiff entitled to the Protection of the United States as a duty from De-fendant, under the United States Constitution, of intervening causes, including but not limited to biotechnology (ies), that cause him stress and a reduced qual-ity of life?

II.    Is Plaintiff entitled to the Protection of the Seat of the United States as duty, as a matter of his Ordered Liberties, and as status as a Basis Official of the United States to terminate the intervening biotechnology (ies) that reduce his quality of life and personal Liberties?

III.   Is the Defendant faithfully and dutifully required to immediately and urgently do this as a matter of State affairs?

IV.    Is Plaintiff caused by a force or power to serve against the protection and pro-scription of the Thirteenth Amendment?

V.    If the court finds that a clear reason exists to grant mandamus, should it use its Big Tucker Act powers to enforce its own mandamus?

VI.   Will Defendant's omission cause the Establishment of Religion?  Or, has it?

### THE FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED BY THE PETITION

I.    The current United States Government was formed by the natural born Americans in 1789.

II.   Plaintiff is a natural-born United States Citizen.

    A.  In 2009, Plaintiff was elected to the Basis of the United States; in other words, as student government president of the Brownsburg Community School Corporation to serve during his final year of high school.

    B.  In 2013, Plaintiff was elected to the Basis of the United States; in other words, as student government president of Emory University to serve during his final year of high school.

    C.  Plaintiff is a descendent of King Rama I, the Hindu-God who is an avatar of Vishnu, through his older twin-son King Luv, who along with his younger twin-son King Kush, were lawful successors of King Rama I's bi-factured kingdom.  Patel is a Leva Patel.

    D.  Plaintiff is a part of the *chh gam* Leva Patel Paditar Samaj through his heritage to Sojitra.

    E.  Plaintiff is a religious minority, for being a descendent of King Rama and for having declaring himself as Rama CCCX (during this on-going peril), and is undoubtedly being persecuted by the Modi Government, a Hindu

Extremist regime.  Plaintiff's *varna ksytharia* royal ancestry is also the epitome or social or political origin.  Int'l Covenant of Civ. & Pol. Rts. (effective in the USA in 1992).  Attacking social status is inherent in a socialist polity.

    F.   The United States Congress acted preemptively.  42 U.S.C. § 2000bb-3(a).

III.   Plaintiff was being battered with this technology prior to 2014, but since May 2014, while during his final weeks at Emory University, Patel was told he would get battered.

    A.   The depression/stress continued to increase until 2017, 2018, 2019, 2020, and 2021, and is currently on-going.

    B.   Patel was told that he would get fat.  Patel was around 150 to 170lbs with an elite body composition and is now 418lbs with over 56% body fat.

    C.   In 2022, Patel's stress was so severe that his height measured one (1) inches less at 5 feet 7 inches at a disability determination.

    D.   Shortly thereafter Patel went to a chiropractor and was released from stress and measured back at 5 feet 8 inches.

    E.   Being royal, rich, not-White, biracial or multiracial, powerful, and/or intelligent is a disability by modern psychology.  This group gets an insignificant percentage from the "pretty" assigned group too.  This group is inherently against the Constitution.  This group has one understanding of ableism and sees it as being offensive. The assailants "do not" sound against Obama.

IV.   Patel has long held the belief that this perilous situation is to ruin his image, including by making him fat, and using psychological weapons because he is of Indian descendent, which is the most intellectually gifted group (IQ), and more than Jews.  In the Indian group, Patel's varna ksytharia makes him smarter and more

intellectual than *brahmans*.  See Patel v. United States, No. 1:22-cv-1446-LAS (C.F.C. 202_).  See Patel v. United States, No. 22-7472 (U.S. 202_).

V.   Patel does not know the batterer or the person controlling the technology that Patel observes operates closely to the technology spotted by the CIA that causes the Havana Syndrome.

VI.  Patel is not speaking about any technology that the United States has inserted into every citizen or category of citizen that does not aid in Patel's current on-going demise.

### CONSTITUTIONAL LAW AND RULES

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court…"it is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, when ever that right is invaded."  Marbury, 5 U.S. at 163.

"A writ of mandamus is an extraordinary remedy which we will not easily grant. In a fairly recent case, Will v. United States, 389 U.S. 90, 96 (1967), the Supreme Court advised the lower federal courts: [T]he party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable.  Calvert Fire Ins. Co. v. Will, 560 F.2d 792, 795 (7th Cir. 1977) (internal quotations marks removed).

"Mandamus may be granted only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  Thomas v. Holder, 750 F.3d 899, 903 (D.C. Cir. 2014).

"While the conditions for obtaining [a writ of mandamus] may be demanding, they are not insuperable." Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367 (2004). "The writ of mandamus is an extraordinary remedy…and will usually be denied when the petitioner could have invoked an adequate, ordinary remedy…Only where an appeal can promise no more than a clearly inadequate remedy may the remedy of mandamus be resorted to,…The court will not consider the extraordinary relief a writ of mandamus provides unless the petitioners can show that this ordinary mode of relief is inadequate." In re GTE Serv. Corp., 762 F.2d 1024, 1026-27 (D.C. Cir. 1985) (internal citations and quotation marks omitted). "[D]iscretionary decisions may be set aside under the mandamus statute…if they fall outside the bounds of "any rational exercise of discretion."" Esquire, Inc. v. Ringer, 591 F.2d 796, 806 n. 28 (D.C. Cir. 1978).

"As an extraordinary remedy, mandamus generally will not issue unless there is a clear right in the plaintiff to the relief sought, a plainly defined and nondiscretionary duty on the part of the defendant to honor that right, and no other adequate remedy, either judicial or administrative, available." Ganem v. Heckler, 746 F.2d 844, 852 (D.C. Cir. 1984).

Further, "in the mandamus context, a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996) (internal citations omitted). "'If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose.'" Swan, 100 F.3d at 978 quoting Am. Cetacean Soc. v. Baldrige, 768 F.2d 426, 433 (D.C. Cir. 1985). See also Id. quoting

Harlow v. Fitzgerald, 457 U.S. 800, 811 n. 17 (1982) ("Suits against other officials — including Presidential aides — generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself."). Swan, 100 F.3d at 978 quoting NTEU v. Nixon, 492 F.2d 587, 604 (D.C. Cir. 1974) (the President may not refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary). The court may still grant mandamus even if mandamus will give only partial relief. Swan, 100 F.3d at 980-81. And, mandamus must be sought with "reasonable promptness." 13th Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 763 (D.C. Cir. 1980). Thomas v. Holder, 750 F.3d 899, 903 (D.C. Cir. 2014). See also Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016).

An Act of Congress is not required to discharge duties of the Privileges and/or Immunities Clauses. In re Neagle, 135 U.S. 1, 2 & 98-9 (1890). See https://constitution.congress.gov/browse/essay/artIV-S2-C1-4/ALDE_00013780/.

## ORDERING PRIVILEGES STATEMENT

Many of the allegations in the complaint will look like it comes from paranoia or delusion based on the premise that the pro se filer, regardless of social status, might be schizophrenia (unable to perceive evidence correctly).[2]

Patel has spoken to mental health experts and psychiatrist, and no one has challenged the possibilities of the digital and technological machinery, some of these businesses are even run by current Republican presidential (candidate) hopefuls.

---

[2] Crist v. Republic of Turkey, 995 F. Supp. 5, 12 (D.D.C. 1998) ("Court requires that a "reasonable opportunity" be given to "adequately" acquire "evidence adduced at trial."); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 n. 31 (1979) cited in Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1364 (Fed. Cir. 2015).

Nevertheless, after stellar performance in high school and the SAT, Patel graduated with a 3.71/4.0 from Emory University and can perceive evidence and his environment in the terms of the enforced constitutional conditioning because Patel graduated with a degree in Political Science and Religion.  Patel entered the University of Notre Dame du Lac after performing well on the LSAT but with the induced technological stress being added.

Patel also performed better than many of the top half of the top 14 schools during his first semester of law school.  Patel's symptoms are stress where even a chiropractor helps release the bones.

Patel's psychological condition do not affect his perceptions of evidence and facts.  Even under milder conditions Patel has own many political student elections.  Under the laws of psychology and psychiatry, Patel is never subject to its main law, mental disability, as it is unapplicable to royalty, state actors, social elites, and intellectual elites.  <u>See</u> Convention on Biological Diversity (CBD) (mandatory executive agreement) (effective in 1993).  Mind you, the later group may carry the symptoms of the mentally disabled but are in forward evolution.  <u>Id</u>.  The American Psychological Association Goldwater Rule also prevents psychologists from making public comments about state actors and public figures; psychologist and psychiatrists are a part of the executive branch and are subject to the mandatory executive agreements and treaties.[3]  <u>Vectrus Servs. A/S v. United States</u>, 164 Fed. Cl. 693, 767 (2023) (citing <u>Valentine v. United States ex rel. Neidecker</u>, 299 U.S. 5, 10 (1936) ("Moreover, the Supreme Court explained that "[i]t is a familiar rule that

---

[3] <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228, 2257 (2022) ("The Court did not claim that this broadly framed right is absolute, and no such claim would be plausible. While individuals are certainly free *to think* and *to say* what they wish about "existence," "meaning," the "universe," and "the mystery of human life," they are not always free *to act* in accordance with those thoughts. License to act on the basis of such beliefs may correspond to one of the many understandings of "liberty," but it is certainly not "ordered liberty."  *Ordered liberty sets limits and defines the boundary between competing interests.*") (italics added).

the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties.")) (citing Restatement (Third) of Foreign Relations Law).  Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority); United Nations Convention on the Rts. of the Child, Pt. 1, arts. 16 & 27(1) (effective 1995) (kid's own status) (mandatory executive agreement); Convention Against Torture & Other Cruel, Inhuman or Degrading Treatment or Punishment (effective 1966) (mandatory authority); Int'l Convention on the Elimination of All Forms of Racial Discrimination (effective 1994) (mandatory authority); and Int'l Covenant on Econ., Soc. & Cultural Rts. (effective 1977) (mandatory executive agreement).  Patel is thus gifted and an elite student and graduated with those marks from Emory University, an elite institution because of the "trickle-down effect."  See e.g., Students for Fair Admissions, Inc. v. Presidents & Fellows of Harvard Coll., No. 20-1199 * 15 & 36 (U.S. 2023) (racism mandates an analysis of the Privileges & Immunities clause and the Equal Protection Cl.) (dicta) (Ordered Liberty is no longer on mute) and Teague, 489 U.S. at 296 & 315 (dicta) (Ordered Liberty & Equal Protection Cl.-Equity).  42 U.S.C. §§ 2000bb et seq.  No reasonable psychiatrist, psychologist, or other thinker[4] can premise an argument against Patel on a temporary mental disability or health because of his own high grade point average or SAT performance from Emory University.[5]

Patel has the affirmative defense of "license"[6] for having the honor, privilege, and rights of his Emory University Bachelor of Arts degree in Political Science with an additional major in Religion (cum laude)[7].  Fed. R. Civ. P. 8(c).  Patel has the affirmative defense

---

[4] Id.

[5] Id.

[6] See supra, p. 9 n. 2.  Marbury, 5 U.S. at 163 (the King will answer subpoenas) (therefore, here, respondent should too).

[7] Patel is the author of "Weight Loss of a Religious Culture" and was given "honors/cum laude."

of "license," "duress," "contributory negligence," and "injury by fellow servant" for being an executive United States state actor to withstanding the prejudicial dismissal of the pleading *sua sponte*.[8]  Id.  & Fed. R. Civ. P. 8(e).  Patel has the affirmative defense of "license" under the United States Religious Freedom Restoration Act of 1993 because religion or grand or fantastic experiences may be perceived as a mental disability such as paranoia, delusions, or schizophrenia.[9]  Id. & 42 U.S.C. § 2000bb-1(a).  Patel is not a novice to the topic herein or the scientific, legal, and constitutional use of language herein.[10]  Fed. R. Civ. P. 8(c).  The petition and the facts herein only need to hold the power of constitutional interpretation.  See *supra*, p. 9 n. 2.  Otherwise, it is likely that the court can be seen as force or branch discrimination not analogizing to white pretty privilege that is also law.[11]

## THE REASONS WHY THE WRIT SHOULD ISSUE

The purpose of the Constitution is to provide Safety and Happiness.  U.S. const. art. VI, § 1 referring to the Decl. of Indep. (1776).  The current biotechnology violates both of Plaintiff's main Protection, a Privilege and Liberty that no one can take away, promised by the United States Constitution.  U.S. const. art. IV, §§ 1-2.  U.S. const. pmbl.  U.S. const. amend. XVI, § 1.  U.S. const. art. VI.  The Defendant owes this to the Plaintiff because the constitution says so. U.S. const. art. IV, §§ 1-2.  U.S. const. pmbl.  U.S. const. amend. XVI, § 1.  U.S. const. art. VI.  People ex Rel. Bakalis v. Weinberger, 368 F. Supp. 721, 724 (N.D. Ill. 1973) ("the duty in the particular situation is so plainly prescribed as to be free from

---

[8] See *supra*, p. 10 n. 3.

[9] Id.

[10] Id.

[11] Id.  Students for Fair Admissions, Inc., No. 20-1199 * 89-90 (U.S. Jun. 29, 2023) (likeables should acculturate from well-liked peers to end their own "stigma").  See also EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 781 (2015) (Thomas, J., concurring & dissenting in part) (decided on colored lines).

doubt and equivalent to a positive command.").  Therefore, this court should grant mandamus.

Patel has correctly sued Defendant United States and need not sue any official or officer by name.  See generally Will, 389 U.S. at 90.  28 U.S.C. § 516.

Patel is a state actor, minimally, since 2009.  The Oval Office is delegated tasks from the United States to protect state actors first and foremost.[12]  Federalist Nos. 42 & 80.  The Basis permitted the American Revolution and the creation of the United States Constitution only once it had agreement that its role would be secured.  Federalist 80 ("And if it be a just principle that every government OUGHT TO POSSESS THE MEANS OF EXECUTING ITS OWN PROVISIONS BY ITS OWN AUTHORITY.").  Madison, Monday, June 18, in Comm. of the whole, on the propositions of Mr. Patterson & Mr. Randolph, The Records of the Federal Convention of 1787, vol. 1, pp. 285-291, New Haven: Yale U. Press, 1911, Edited by Max Farrand, https://oll.libertyfund.org/title/farrand-the-records-of-the-federal-convention-of-1787-vol-1#lf0544-01_head_163;       Madison, Monday, June 25, in Convention, The Records of the Federal Convention of 1787, vol. 1, pp. 398-405, New Haven: Yale U. Press, 1911, Edited by Max Farrand, https://oll.libertyfund.org/title/farrand-the-records-of-the-federal-convention-of-1787-vol-1#lf0544-01_head_210; Yates, Monday, June 25, in Convention, The Records of the Federal Convention of 1787, vol. 1, pp. 410-416, New Haven: Yale U. Press, 1911. Edited by Max Farrand, https://oll.libertyfund.org/title/farrand-the-records-of-the-federal-convention-of-1787-vol-1#lf0544-01_head_211.  The Basis' last major show might have been during the Glorious Revolution when Parliament received sovereignty.  Hertzler, James R. "Who

---

[12] See also United States Order of Precedence by the Office of the Chief of Protocol of the United States Dep't of State, https://www.state.gov/wp-content/uploads/2022/02/United-States-Order-of-Precedence-February-2022.pdf (revised Feb. 11, 2022).  Printz v. United States, 521 U.S. 898, 918 (1997) quoting Principality of Monaco v. Mississippi, 292 U.S. 313, 322 (1934).

Dubbed It 'The Glorious Revolution?'" 19 <u>Albion: A Quarterly Journal Concerned with British Studies</u> 4, pp. 579–85 (1987). *JSTOR*, <u>https://www.jstor.org/stable/4049475</u>. Accessed 4 May 2023. p. 582 (a more glorious Crown in the next world) (who writes the rules). Like during the rule of Julius Ceaser, when an urgent cry from its Basis-magistrate would come, Caesar, from the Seat, would send re-enforcements. U.S. const. art. II, § 1.[13] Patel has issued that cry for help to the White House several times.[14] Patel and the rest of the executive branch, under its unitary executive theory, relies on this United States District Court to issue mandamus to remedy the problem, and return Patel's ordered liberty. Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority). In fact, the United States is in an international treaty to protect its Basis and its lifelong officials. <u>Id</u>. Therefore, mandamus should be granted.

Patel is a state actor with two titles. Patel started in politics when he was a kid and took to prominence once he made a solo porn or sex tape, as it was elite fashion then, as a teenager, a couple of years becoming student government president. United Nations Convention on the Rts. of the Child, Pt. 1, arts. 16 & 27(1) (effective 1995) (kid's own status) (mandatory executive agreement). The current peril is probably intertwined with Patel's social and political behavior related to this matter. <u>Id</u>. and Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority). The United States executive branch is in an international agreement to enforce United Nations Convention on the Rts. of the Child's protection, but it is confusing why the stress was elevated and turned on in 2014 (and once again in 2017, etc.), that has now caused morbid obesity, because Patel was due

---

[13] <u>Arthrex, Inc.</u>, No. 19-1434 * 23, 594 U.S. ____ (U.S. 2021) (State powers are vested in all branches of gov't, although is a political power exercised by the Head of State).

[14] <u>Rubin v. United States</u>, 525 U.S. 990, 990-91 (U.S. 1998) (Breyer, J., dissenting from denial of cert.) ("The physical security of [an honorable or an excellent] has a special legal role to play in our constitutional system."). <u>Id.</u> at 995 (but for privileges, there would be a loss of trust in enforcement).

and protected by his own pretty privilege of cis gender male assignment – other than prevent his own presidential campaign. See *supra*, p. 11 n. 11. Every minute under this unwarranted stress situation is a minute lost in shaping Patel's own identity for his presidential campaign. Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority). Therefore, the court should issue mandamus.

Therefore, Patel has immunity to all force from the United States Constitution. U.S. const. art. IV, § 2. The absolute rule is that neither the federal nor state sovereign (and other local governments) has power that the common law Basis officials do not have. Nixon, 457 U.S. at 770. Federalist No. 42 & 80. Power is devolved to these sovereigns and the Seat. Id. The Seat handles and manages the operations of the community's resources according to its constitution of laws and agreements. Id. & U.S. const. art. VI, § 1. Patel needs to have his immunity administered and enforced again, and the court cannot "deny" it. U.S. const. art. IV, § 1 & amend. XIV, § 1. No officer or official of the United States has immunity from this civil action. Nixon, 457 U.S. at 789. Therefore, the court has at least one clear reason to grant mandamus.

After the ratification of the Fourteenth Amendment, this court has the independent inherent responsibility of enforcing the privileges and immunities clause of Section 1 of Article 1 of the Amendment. U.S. const. amend. XIV, § 1. Protection of the United States and appreciation a state officer's own immunity is an unconditional and first promise of the United States Constitution. Corfield v. Coryell, 6 Fed. Cas. 546, 552 (C.C.E.D.Pa. 1823) ("Protection by the government"). Madison, Madison, & Yates. Federalist No. 42 & 80. Federalist 78 makes it clear that the independent judiciary cannot participate in the "wealth of society," which is an inherent State, and Treasury, affair but also reverted back to the President. Gonzales, 348 U.S. at 412. Fed. R. Civ. P. 8(c)(1) of "license" is premised and relies almost exclusively on the privileges and/or immunities clauses. U.S. const.

amend. V & amend. XIV.  Congress, much like Parliament, are the more recent delegate of the people and of the latest survivors of the inherently violent Basis.  Federalist No. 42 & 80.  Congress has therefore authorized THE HONORABLE of this court to form a Big Tucker Act, 28 U.S.C. § 1491(a), contract to enforce its own rulings; the use of the Big Tucker Act authority would also be warranted by the court and/or the Chief Judge who is responsible for the workforce, business, domestic and foreign investments, and development, as a matter of law.  Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997); City of Joliet v. New W., L.P., 921 F.3d 693, 698 (7th Cir. 2019); & In re Compl. of Ingram Barge Co., 194 F. Supp. 3d 766, 803 (N.D. Ill. 2016).  Therefore, the court should grant mandamus and use any of the necessary Tucker Act powers to enforce its own mandamus, especially because the sovereignty of the United States is of suspect.  See generally Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc., 219 F. Supp. 3d 878, 893 (S.D.I.N. 2015).

Patel is a religious minority that is being persecuted by the Modi Government because of his royal heritage.[15]  **18 U.S.C. § 1091(a)(2)-(4).**  The United States is in an international treaty to protect people of social and/or political heritage, including but not limited to royals.  Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority). The International Covenant of Civil and Political Rights went into effect in 1992.  Id. and Vectrus Servs. A/S, 164 Fed. Cl. at 767(citing Valentine, 299 U.S. at 10 ("Moreover, the Supreme Court explained that "[i]t is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties.")) (citing Restatement (Third) of Foreign Relations Law).  Lawless violence on Patel undoubtedly

---

[15] Payne-Elliott v. Roman Cath. Archdiocese of Indpls., Inc., 193 N.E.3d 1009, 1013 (Ind. 2022) (Church autonomy doctrine is irrelevant as they are not authorized to touch anyone.).

disparages Patel's own social status, and the main function of the United States Constitution is State affairs or protect every citizen's or state actors' status and other Ordered Liberties.  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758, 769, & 787 (1985) ("his own good name").  U.S. const. amend. XIV, § 1.  Even with limited resources, Patel is living in an unfair state of being.  Villars v. United States, 590 F. App'x 962 * 3-4, 6& 9 (Fed. Cir. 2014).  The United States must terminate the unconsented and nonconsensual intervening causes Patel has discussed herein.  Calvert Fire Ins. Co., 560 F.2d at 795.  The current peril, attacking the entirety of his lifestyle and public life, against Plaintiff, a likeable or well-liked and revered citizen and global/international United States basis official has the smell of racism (colorism), and treaties mandate interpretation, as a matter of law – if quakes like a duck, if it looks like a duck, then it's a duck.  See generally Int'l Convention on the Elimination of All Forms of Racial Discrimination (effective 1994) (mandatory authority).  See e.g., Students for Fair Admissions, Inc., No. 20-1199 * 15 & 36 (U.S. 2023) (racism mandates an analysis of the Privileges & Immunities clause and the Equal Protection Cl.) (dicta) (Ordered Liberty is no longer on mute) and Teague, 489 U.S. at 296 & 315 (dicta) (Ordered Liberty & Equal Protection Cl.-Equity).  42 U.S.C. §§ 2000bb et seq.  **The stress significantly execrated again at the University of Notre Dame after he was elected to student office again.**  The right to recovery, including through equitable § 1361 or § 1651 mandamus, is the principle of equal justice under law.  Boag v. MacDougall, 454 U.S. 364, 368 (1982) and Boddie v. Connecticut, 401 U.S. 371, 389 (1971).  Therefore, the court should grant mandamus**, even on circumstantial evidence.**  Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority); United Nations Convention on the Rts. of the Child, Pt. 1, arts. 16 & 27(1) (effective 1995) (kid's own status) (mandatory executive agreement); Convention Against Torture &

17

Other Cruel, Inhuman or Degrading Treatment or Punishment (effective 1966) (mandatory authority); Int'l Convention on the Elimination of All Forms of Racial Discrimination (effective 1994) (mandatory authority); and Int'l Covenant on Econ., Soc. & Cultural Rts. (effective 1977) (mandatory executive agreement).  Hazelhurst Oil Mill Fertilizer Co. v. United States, 42 F.2d 331, 340 (Fed. Cir. 1930) (the court must attempt to get onto "equal terms").  See Fed R. Civ. P. 8(c) affirmative defense.

Patel is being caused to involuntary serve.  U.S. const. amend. XIII.  Patel means no equivocation while speaking about equivocations in that the current situation seems that Rosseau's dream that "kings become the slaves" is coming true.  Talbot v. Jansen, 3 U.S. 133, 139-40 & 164 (1795).  Or, that Leo Tolesty scholars are witnessing a new pattern that "Kings are the slaves of history."  Id.  Plato would say that what is true for Kings is true for his people, masters, slaves, and the Kings' future ancestors.  Downes v. Bidwell, 182 U.S. 244, 297 n. 10 (1901) (Free Soil Party resolution: "Congress has no more power to make a slave than to make a king; no more power to institute or establish slavery than to institute or establish a monarchy. No such power can be found among those specifically conferred by the Constitution, or derived by any just implication from them.").  The statement that the President of the United States is not a king is simply a spiritual one to show the distinction of the chief of state.  Federalist 69.  That is not say that presidents of the Basis of the United States who devolve power to the Seat President are kings; nevertheless, they are the ones designed to be with the most authority and power.  Cf. Talbot, 3 U.S. at 140 ("basis of society").  The environment might have changed, too much, for someone; thus, Patel might be in a "patriotic" showing that the people are in power.  Id. In fact, Patel does not even want to be filing these judicial cases, help create precedent, or help test the national consciousness.  Int'l Covenant of Civ. & Pol. Rts. (effective 1992).

The Supreme Court has signaled that the federal courts need to create the order of Ordered Liberty.  See *supra*, p. 10 n. 3.  This is neither play nor fair play.  Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449, 468 (2017) (Thomas, J., concurring); Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246, 2254 (U.S. 2020); and Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 334-35 (1987). 42 U.S.C. § 2000bb-1(c).  The matter is too circumstantial where the doctrine of *res ipsa loquitur* applies.  See e.g., Del. Coach Co. v. Reynolds, 71 A.2d 69, 73 (Del. 1950).  The court needs to act immediately and issue mandamus.  U.S. const. art. IV, §§ 1-2.

**The United States has Established Religion in this peril of Patel as it is Nazi science originating from Hindu Theocracy and Religion, instructed by Netaji Bose to Adolf Hitler (modern-day Pakistan).  18 U.S.C. § 1091(a)(2)-(4).  Modern psychology and psychiatry weaponry comes from the Holocaust when Fuhr Hitler determined that the quality of life for Jews in their ghettos was not worth it.  Many of the elite Jews carried the blame for the harming Germany for originating from Jewish Ghettos.  Currently, victorious Jews and their descendants victimize themselves as survivors for the interests of currency, deflating grades, controlling eugenics, and foreign policy; as we see in many of the Ivy Leagues; South Asians royal and other South Asians are inherent threats to their appeased agenda.  Jews also hate Iran and Ordered Liberty.  See Convention on Biological Diversity (CBD) (mandatory executive agreement) (effective in 1993).  Patel's family originates from Iran then from India.  This peril can be to prevent the Iran deal.  All communities should be treated equally.  18 U.S.C. § 1091(a)(2)-(4).  I am *dharma*.  42 U.S.C. §§ 2000bb et seq.  Science and religion are inherently at odds.  Id.  Modern psychology is also based on dharma and Buddhism, which is religious violence and war, not medicine.  Neither is Patel from the slum nor has he been or his ancestors unlike many Patel's.  Trinity Lutheran Church of Columbia, Inc., 582**

U.S. at 468; <u>Espinoza</u>, 140 S. Ct. at 2254; and <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints</u>, 483 U.S. at 334-35.  At a minimum, the matter is circumstantial enough to give rise to Established Religion.  Int'l Covenant of Civ. & Pol. Rts. (effective 1992) (mandatory authority); United Nations Convention on the Rts. of the Child, Pt. 1, arts. 16 & 27(1) (effective 1995) (kid's own status) (mandatory executive agreement); Convention Against Torture & Other Cruel, Inhuman or Degrading Treatment or Punishment (effective 1966) (mandatory authority); Int'l Convention on the Elimination of All Forms of Racial Discrimination (effective 1994) (mandatory authority); and Int'l Covenant on Econ., Soc. & Cultural Rts. (effective 1977) (mandatory executive agreement).  The power is unconstitutionally disturbed and to another.  The power is unconstitutionally disturbed and to another.  Moreover, this is a mockery in our republic because my haters' are being unduly "represented" to create this incapacitation.  The court needs to act immediately and issue mandamus.  <u>Arthrex, Inc.</u>, 141 S. Ct. at 1983 & 1988.

Furthermore, it is constitutionally assumed, consistent with the Father of the Constitution, that it is irregular for the Oval Office or the Executive Branch not to protect a law-abiding citizen, even because Due Process cannot shed the natural-born's protection of the United States citizen.  <u>Gonzales</u>, 348 U.S. at 412 ("underlying concepts of procedural regularity and basic fair play").  <u>Corfield v. Coryell</u>, 6 Fed. Cas. 546, 552 (C.C.E.D.Pa. 1823) ("Protection by the government").  U.S. const. amend. V & amend. XIV.  **<u>Arthrex, Inc.</u>, 141 S. Ct. at 1983 & 1988.**

The <u>Burnett v. Bowen</u>, 830 F.2d 731, 739 (7th Cir. 1987) factors are satisfied: (1) Patel has a clear right to relief to be protected by the superior laws of the United States as a natural-born citizen and independently as a State actor (letters patent of title and office

self-issues by the United States Constitution that is king to the Basis officials), e.g. Federalist Nos. 42, 69, & 80 (2) the executive enforcement agreements herein cause the "plainly defined and peremptory duty on the part of the respondent to do the act in question," cf. Briehl v. Dulles, 248 F.2d 561, 567 (D.C. Cir. 1957) (here, though, the President might have discretion, although I argue that he does not under the original and amended constitution, see Federalist 69 ("The king of Great Britain is emphatically and truly styled the fountain of honor. He not only appoints to all offices, but can create offices. He can confer titles of nobility at pleasure; and has the disposal of an immense number of church preferments. There is evidently a great inferiority in the power of the President, in this particular, to that of the British king; nor is it equal to that of the governor of New York, if we are to interpret the meaning of the constitution of the State by the practice which has obtained under it."), but not the Secretary of State who has the peremptory obligation to act or a minister duty) (see Harlow, 457 U.S. at 811 n. 17), see NTEU, 492 F.2d at 604, and cf. Bauer v. Acheson 106 F. Supp. 445, 449 (D.D.C. 1952) (political matter, unlike here, was entirely up to the Secretary of State), and (3) Patel has done his due diligence by contacting all jurisdictions he can think of and no other adequate remedy at law exists.  Thomas, 750 F.3d at 903.  Ganem, 746 F.2d at 852.  Swan, 100 F.3d at 978.  Marbury, 5 U.S. at 163. See supra, p. 8 n. 2.  Will, 389 U.S. at 96.  It would be an abuse of discretion not to issue mandamus **because otherwise this is subjugation**.  Cheney, 542 U.S. at 367.  Harlow, 457 U.S. at 811 n. 17.  **Several newspapers have shown that jargon from the political science and social sciences is now being used to prosecute extremist Americans, even those who have been faithful to the Organic Law under the United States Constitution.  Exs. A-B.  Patel is a political science major and inherently uses this language.  Id.  Due to Patel's social and state status, Patel is above racism and organized racism and remediation, in accord with the Founders.  Mandamus should issue.**

Therefore, mandamus should issue, as a matter of law, including to the President for urgent due delegation and release of the United States' resources, as it is an administrative duty.  <u>Marbury</u>, 5 U.S. at 167 (judiciary has a right to issue writ of mandamus to President).  <u>Cf.</u> <u>Glob. Relief Found. Inc. v. O'Neill</u>, 207 F. Supp. 2d 779, 796-7 (N.D. Ill. 2002).  Jury trial be reserved for the alternate.

And, in the alternative, I move that this court show cause of an alternate adequate remedy at law.  <u>Cheney</u>, 542 U.S. at 367.

## CONCLUSION

- Grant Mandamus.

- Issue mandamus to the President,

- *Sua sponte* add the Governor of Hawaii or Indiana or FBI and issue mandamus; or,

- **Grant $1 million Tucker Act consideration for all consideration each year under this situation since 2018: 2018, 2019, 2020, 2021, and 2022 ($5M) and pro rata for 2023 thus far ($8K) for a total of $5,800,000, until the multi-trillion-dollar matter described therein C.F.C. is resolved, or until another case is resolved (UPS, Google, or University of Notre Dame) and Patel receives compensation.  <u>Patel v. United States</u>, No. 1:22-cv-1446-LAS (C.F.C. 202_), <u>aff'd</u>, No. 23-1325 (Fed. Cir. 202_), <u>pending cert.</u>, No. 22-7472 (U.S. 202_).**


Respectfully submitted,


/s/ Raj K. Patel
Rama CCCX
T.E., T.E. Mr. Raj K. Patel, AA, BA, Former JD Candidate (*pro se*)
6850 East 21st Street
Indianapolis, IN 46219
Marion County
317-450-6651 (cell)

rajp2010@gmail.com
www.rajpatel.live

T.E. Mr. President/Student Body President, Student Gov't Ass'n of Emory U., Inc. 2013-2014 (corp. sovereign 2013-present)
T.E. Mr. Student Body President, Brownsburg Cmty. Sch. Corp./President, Brownsburg High Sch. Student Gov't 2009-2010 (corp. sovereign 2009-present)
Rep. from the Notre Dame L. Sch. Student B. Ass'n to the Ind. St. B. Ass'n 2017
Deputy Regional Director, Young Democrats of Am.-High Sch. Caucus 2007-2009
Co-Founder & Vice Chair, Ind. High Sch. Democrats 2009-2010
Vice President of Fin. (Indep.), Oxford C. Republicans of Emory U., Inc. 2011-2012

Intern, Jill Long Thompson for Governor (2008)

Volunteer, Barack Obama for Am. (2008)

Intern, Marion Cnty. Clerk Elizabeth "Beth" White for Sec'y of St. of the St. of Ind. (2014)

*Former J.D. Candidate, Notre Dame L. Sch. (2015-17)

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing *Pro Se* Emergency Amended Writ of Mandamus on 8/7/2023 to below individuals via the Clerk of Court and e-mail:

> **The United States**
> AG Merrick Garland
> U.S. Department of Justice
> 950 Pennsylvania Avenue NW
> Washington DC 20530
>
> **The United States**
> **Clare E. Conners**
> United States Attorney's Office
> 300 Ala Moana Blvd., #6-100
> Honolulu, HI 96850
> USAHI.PublicAffairs@usdoj.gov

Respectfully submitted,

/s/ Raj Patel
T.E., T.E. Raj K. Patel (*Pro Se*)
6850 East 21st Street
Indianapolis, IN 46219
317-450-6651 (cell)
rajp2010@gmail.com
www.rajpatel.live

Dated: August 7, 2023




# EXHIBIT A
# BREITBART

TRENDING:   BIDEN CRIME FAMILY     2024 RACE     WOKE WILD!     BROKEN BORDER     SOUND OF FREEDOM     BIG TEC

# FBI: INTERNET SLANG LIKE 'BASED,' 'RED PILL' ASSOCIATED WITH 'EXTREMISM'

  *561*      TWEET           EMAIL                    TRUTH



Getty Images

*by* ALLUM BOKHARI  ⋮  10 Apr 2023    *567*

▶                            🎧 LISTEN TO STORY                          2:50

FBI documents obtained by the Heritage Foundation through a Freedom of Information Act (FOIA) request show the Bureau associating a wide variety of internet slang with "extremism." According to the FBI, words like "based" and "Chad" are signs of violent extremism.

The glossary of terms can be found in a document about "incels," or involuntary celibates, and "racially or ethnically motivated violent extremism," and can be read in full here.

The document associates common internet terms like "based," "red pill," and "accelerationism" with the latter, while "Chad," "NEET," and "it's over" are associated with the former.



**Oversight Project** ✔ · Apr 3
@OversightPR · **Follow**

NEW:  Docs we obtained show how @FBI equates protected online speech to violence.

According to @FBI using the terms "based" or "red pilled" are signs of "Racially or Ethnically Motivated Violent Extremism"

**Oversight Project** ✔
@OversightPR · **Follow**

Using terms like "looksmaxxing", "Chad", and "Stacy" will get you on an @FBI list for "Involuntary Celibate Violent Extremism."



4:13 PM · Apr 3, 2023                                    ⓘ

❤ 3.1K    ↩ Reply    ⌐ Copy link

**Read 363 replies**

"Based," per the FBI, is used by racial extremists to refer to "someone who has been converted to racist ideology."

"Red pill," according to the document, means someone who has "adopted racist, anti-Semitic, or fascist beliefs."

"Accellerationism," according to the FBI, is the view that "the existing social order should be pushed to such a degree that Western countries become failed states, giving rise to changes that would reshape the world in radical ways."

According to KnowYourMeme, the web's leading archive of internet slang, the FBI is off the mark on many of these terms.

"Based," in particular, is in much wider usage, a term deployed by a variety of people of all ideological stripes to refer to things that are agreeable or cool in addition to its more political use as a term for things that are anti-woke.

"Red pill," also, does not necessarily have ideological connotations. The phrase "red pill me on X," is a common phrase used by online posters to request explanations on various topics. In the crypto community, it can refer to requests for explanations about obscure cryptocurrency projects.

The document also labels a number of common internet terms as "incel" references.

"It's over," a common term, often used ironically for exaggerative effect, is a statement of general pessimism. But for the FBI, it is a reference for "the hopelessness of being an incel."

"Chad," a figure who can frequently be found in internet jokes, is also specifically linked to incels for the FBI, in addition to being "race-specific."

The Daily Signal, the Heritage Foundation's news organization, attempted to reach the FBI for comment but received no response.

***Allum Bokhari is the senior technology correspondent at Breitbart News. He is the author of #DELETED: Big Tech's Battle to Erase the Trump Movement and Steal The Election.***

READ MORE STORIES ABOUT:

Politics, Tech, FBI, Heritage Foundation, Internet memes

 SHARE     TWEET     EMAIL

## COMMENTS

Comment count on this article reflects comments made on Breitbart.com and Facebook. Please let us know if you're having issues with commenting.

We welcome thoughtful responses and inputs. Comments with personally identifiable information, harassment, threats, or other violations will be removed.

### 567 Comments

Join the discussion...

💬 567 COMMENTS          JOIN THE DISCUSSSION



| SOCIAL | BREITBART STORE > |
|---|---|
| f  🐦  ▶ | |



## MOST POPULAR



**Pence: Trump Asked Me to Overturn the Election, Reject the Vote Outright**

*4,224 comments*



**NYC Begins Housing Migrants in Parks Across Ultra-Liberal Brooklyn**

*256 comments*



**Megan Rapinoe Ends Her Career**

**with Missed Penalty Kick**

*8,885 comments*



**Utah GOP Senate Candidate Trent Staggs Rips Romney as 'So Out of Touch'**

*4,060 comments*



**Lauro: 'Technical Violation of the Constitution' Is Not 'Criminal'**

*1,209 comments*



**Exclusive — Trump on DeSantis: 'He's Crashing Badly'**

*4,449 comments*



**Exclusive – Trump in Video Special Lays Out Policy Vision for Country**

*6,952 comments*



**VIDEO: Trans Protester Brings Cycling World Championship to a**

*238 comments*



**Democrats Push 1,000 Percent Excise Tax on AR-15s**

*1,497 comments*



**Pornhub Blocks Access in States Including Arkansas and Virginia**

*755 comments*





## FROM THE HOMEPAGE

**Exclusive — Trump**





Exclusive – Trump Roasts Special Prosecutor Jack Smith, Lays Out Woke Visuals for Country Upon Return to Office

Exclusive – Trump Roasts Special Prosecutor Jack Smith, Lays Out Woke Visuals for Country Upon Return to Office

656   *Comments*

6,952   *Comments*



Pollak: Biden Is Turning U.S. into Putin's Russia with Trump Indictments

Pollak: Biden Is Turning U.S. into Putin's Russia with Trump Indictments

216   *Comments*



New York Times: Mandatory E-Verify Raises Wages for Florida Workers

New York Times: Mandatory E-Verify Raises Wages for Florida Workers

209   *Comments*





Chicago: At Least 25
Shot Friday Through
Sunday Afternoon

284 *Comments*

House Armed
Services Chair
Demands Answers
on Biden Decision to
Cancel Space
Command Move to
Alabama

107 *Comments*

DeChambeau Gets
First LIV Golf Win in
Style with a 58 at
Greenbrier



36 *Comments*





VIDEO: Trans Protester Brings Cycling World Championship Race to a Stop

**238** *Comments*



'Down Goes Anderson': Guardian's Announcer Calls On-Field Brawl Like Boxing Match

**88** *Comments*



Star Soprano Anna Netrebko Sues Met Opera for Cutting Ties over Russia-Ukraine War

**350** *Comments*



### Pornhub Blocks Access in States Including Arkansas and Virginia in Response to Age Verification Laws

Pornhub Blocks Access in States Including Arkansas and Virginia in Response to Age Verification Laws

755 *Comments*

### Democrats Push 1,000 Percent Excise Tax on AR-15s

Democrats Push 1,000 Percent Excise Tax on AR-15s

1,497 *Comments*



---

**BREITBART NEWS**

Masthead              Terms of Use         Store

About Us              Privacy Policy       Get the App

Accessibility         Advertise            Newsletters
Statement
                      Contact Us           Send A Tip
Policy Info
                      Careers              Sitemap

Copyright © 2023 Breitbart



# EXHIBIT B



Federal Bureau of Investigation
Department of Homeland Security

Strategic Intelligence Assessment and Data on
Domestic Terrorism

*Submitted to the Permanent Select Committee on Intelligence, the Committee on Homeland Security, and the Committee of the Judiciary of the United States House of Representatives, and the Select Committee on Intelligence, the Committee on Homeland Security and Governmental Affairs, and the Committee of the Judiciary of the United States Senate*

October 2022

## **Table of Contents**

I.      **Overview of Reporting Requirement** ...................................................... 2
II.     **Executive Summary** ................................................................................ 2
III.    **Domestic Terrorism: Definitions, Terminology and Methodology** ........... 3
IV.     **Strategic Intelligence Assessment** ......................................................... 6
V.      **Discussion and Comparison of Investigative Activities** ......................... 7
VI.     **Data on Domestic Terrorism** ................................................................ 18
VII.    **Recommendations** ................................................................................. 25
        **Appendix A** ........................................................................................... 28
        **Appendix B** ........................................................................................... 34
        **Appendix C** ........................................................................................... 37

## **I.  Overview of Reporting Requirement**

Pursuant to Section 5602(a) and (b) of the National Defense Authorization Act for Fiscal Year (FY) 2020[1] (hereafter "the Act"), the Federal Bureau of Investigation (FBI) and the Department of Homeland Security (DHS), in consultation with the Office of the Director of National Intelligence (ODNI), including the National Counterterrorism Center (NCTC), and the Department of Justice (DOJ), jointly produced two reports on domestic terrorism (DT), which provided data as of the end of FY 2019.[2] Section 5602(d) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the Director of National Intelligence (DNI) in a manner consistent with the authorities and responsibilities of such Director, to jointly submit to the appropriate Congressional committees annual updates to those reports. This report constitutes the annual updates for FY 2020 and FY 2021.

## **II.  Executive Summary**

Preventing terrorist attacks remains a top priority for both the FBI and the DHS, and the FBI serves as the lead investigative agency on terrorism matters. The threat posed by international and domestic threat actors has evolved significantly since 9/11. One of the most significant terrorism threats to the Homeland we face today is posed by lone offenders[3] and small groups of individuals who commit acts of violence motivated by a range of ideological beliefs and/or personal grievances. Of these actors, domestic violent extremists represent one of the most persistent threats to the United States today. These individuals are often radicalized online and look to conduct attacks with easily accessible weapons. Many of these violent extremists are motivated and inspired by a mix of ideological, socio-political and personal grievances against

---

[1] Public Law 116-92, enacted 20 December 2019.

[2] The report *Domestic Terrorism: Definitions, Terminology, and Methodology* was published in November 2020; and the report *Strategic Intelligence Assessment and Data on Domestic Terrorism* was published in May 2021.

[3] The FBI and DHS define a lone offender as an individual motivated by one or more violent extremist ideologies who, operating alone, supports or engages in acts of unlawful violence in furtherance of that ideology or ideologies that may involve influence from a larger terrorist organization or a foreign actor. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism, and may be constitutionally protected.

their targets. With this report, we are providing our strategic intelligence assessments on DT, a detailed discussion of our procedures and methods to address DT threats, as well as data on DT incidents and FBI investigations.

### III. Domestic Terrorism: Definitions, Terminology and Methodology

Section 5602(a) of the Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly develop, to the fullest extent feasible and for purposes of internal recordkeeping and tracking, uniform and standardized definitions of the terms "domestic terrorism," "act of domestic terrorism," "domestic terrorism groups," and any other commonly used terms with respect to DT; methodologies for tracking incidents of DT; and descriptions of categories and subcategories of DT and ideologies relating to DT; and to jointly submit the information in a report to the appropriate Congressional committees.

### *Definitions*

For the FBI's purposes, "domestic terrorism" is defined by 18 U.S.C. § 2331(5), as activities:

- Involving acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;
- Appearing to be intended to:
  o Intimidate or coerce a civilian population;
  o Influence the policy of government by intimidation or coercion; or
  o Affect the conduct of a government by mass destruction, assassination or kidnapping; and
- Occurring primarily within the territorial jurisdiction of the United States.

DHS derives its definition of DT from the Homeland Security Act definition of terrorism, 6 U.S.C. § 101(18), which is similar, but not identical, to the 18 U.S.C. § 2331(5) definition. Under the Homeland Security Act of 2002, terrorism is defined as any activity that:

- Involves an act that:
  o Is dangerous to human life or potentially destructive of critical infrastructure or key resources; and
  o Is a violation of the criminal laws of the United States or of any State or other subdivision of the United States; and
- Appears to be intended to:
  o Intimidate or coerce a civilian population;
  o Influence the policy of a government by intimidation or coercion; or
  o Affect the conduct of a government by mass destruction, assassination, or kidnapping.

Both references in U.S. Code are definitions and not federal criminal charging statutes for DT.

*Terminology*

The FBI and DHS use the term "domestic violent extremism" to refer to DT threats. The word "violent" is important because mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics does not constitute violent extremism and may be constitutionally protected. Under FBI policy and federal law, no investigative activity may be based solely on activity protected by the First Amendment, or the apparent or actual race, ethnicity, national origin, religion, gender, sexual orientation, or gender identity of the individual or group. Similarly, DHS's Office of Intelligence and Analysis (I&A) is prohibited from engaging in any intelligence activities for the purpose of affecting the political process in the United States or for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, and DHS policy prohibits any intelligence activities based solely on an individual's or group's race, ethnicity, gender, religion, sexual orientation, gender identity, country of birth, or nationality.

A "domestic violent extremist" (DVE) is defined as an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence dangerous to human life.

The U.S. government, including the FBI and DHS, continually reviews and evaluates intelligence and information from multiple sources to ensure it appropriately identifies and categorizes national security threats, including those that are criminal in nature, to the Homeland. As part of this continual internal review, the FBI and DHS prioritize threat categories, which are further described below, as needed, and as threats evolve. While categories help the FBI and DHS better understand the threat associated with broad categories of DT-related criminal actors, the FBI and DHS recognize motivations vary, are nuanced, and sometimes are derived from a blend of ideologies. The categories also inform our intelligence and prevention efforts.

Since 2019, the U.S. government has used the following five threat categories to understand the DT threat:

(1) **Racially or Ethnically Motivated Violent Extremism:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political or social agendas which are deemed to derive from bias, often related to race, held by the actor against others, including a given population group**.** Racially or ethnically motivated violent extremists (RMVEs) use both political and religious justifications to support their racially- or ethnically-based ideological objectives and criminal activities. One set of RMVE threat actors use their belief in the superiority of the white race to justify their use of violence to further their political, cultural, and religious goals. A separate and distinct set of RMVE threat actors use real or perceived racism or injustice in American society, a separate Black Homeland, and/or violent interpretations of religious teachings to justify their use of violence to further their social or political goals.

**(2) Anti-Government or Anti-Authority Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas, which are deemed to derive from anti-government or anti-authority sentiment, including opposition to perceived economic, social, or racial hierarchies, or perceived government overreach, negligence, or illegitimacy. This threat category typically includes threats from anarchist violent extremists (AVEs), militia violent extremists (MVEs), and sovereign citizen violent extremists (SCVEs).

**(3) Animal Rights/Environmental Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas by those seeking to end or mitigate perceived cruelty, harm, or exploitation of animals and/or the perceived exploitation or destruction of natural resources and the environment.

**(4) Abortion-Related Violent Extremism:** This threat category encompasses the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas relating to abortion, including individuals who advocate for violence in support of either pro-life or pro-choice beliefs.

**(5) All Other Domestic Terrorism Threats:** This threat category encompasses threats involving the potentially unlawful use or threat of force or violence, in violation of federal law, in furtherance of political and/or social agendas which are not otherwise exclusively defined under one of the other threat categories. Such agendas may derive from, but are not limited to, a mixture of personal grievances and beliefs, political concerns, and aspects of conspiracy theories, including those described in the other DT threat categories. Some actors in this category may also carry bias related to religion, gender, or sexual orientation. Several DVEs have combined components of different ideologies to develop a personalized belief system that they use to justify violent, criminal action.

*Methodology*

The FBI recognizes a DT incident as an ideologically-driven criminal act, including threats made to or acts of violence against specific victims, in furtherance of a domestic political and/or social goal. For DHS, these ideologically driven criminal acts must be dangerous to human life or potentially destructive to critical infrastructure or key resources to meet the definition of DT. A single incident may be part of a scheme or a serial criminal or violent activity conducted by the same perpetrator(s) using the same tactic(s). The FBI and DHS recognize a DT plot as a combination of criminal activity and planning that collectively reflect steps toward criminal action in furtherance of a domestic political and/or social goal. Disrupted DT plots are plots which, absent law enforcement intervention, could have resulted in a DT incident.

The FBI makes every effort to document lethal and non-lethal DT incidents, but it is important to note there is no mandatory incident reporting requirement for state, local, tribal, and territorial (SLTT) law enforcement agencies to report criminal activity that appears to be ideologically motivated and is mitigated at the SLTT level. DHS complements the FBI's effort to document DT incidents through a parallel effort to identify and analyze DT attacks and plots via engagement with SLTT law enforcement through DHS intelligence officers deployed to fusion centers, review of DHS components' information, and open source research. The results of these efforts are also shared with the FBI.

## IV.  Strategic Intelligence Assessment

The FBI, in coordination with prosecutors in the U.S. Attorneys' Offices (USAOs) and DOJ's National Security Division (NSD), continues to successfully investigate and disrupt DVE activities, plots, and threats. The FBI and DHS continue to provide strategic warnings and analysis of the heightened DT threat. DVE lone offenders acting independently and without direction from specific groups are the primary actors in lethal DT incidents. The FBI and DHS assessed lone offenders and small groups of individuals would continue to be the primary actor in these attacks and would continue to pose significant mitigation challenges due to their capacity for independent radicalization and mobilization and preference for easily accessible weapons. The FBI and DHS assessed multiple factors, including perceptions of – or responses to – political and social conditions and law enforcement and government overreach, would also almost certainly continue to contribute to DVE radicalization, target selection, and mobilization in violation of federal, state, and local law and hate crime[4] statutes.

In 2020, the FBI and DHS assessed RMVEs, primarily those advocating the superiority of the white race, likely would continue to be the most lethal category of the DT threat to the Homeland. In 2020, four DT-related attacks resulted in four deaths. Three of the attacks were committed by DVEs with anti-government or anti-authority violent extremist ideologies, specifically militia violent extremism and anarchist violent extremism. One lethal attack was committed by an RMVE who allegedly used his interpretations of religious teachings to justify a murder. In 2020, for the first time since 2011, no lethal attacks were committed by RMVEs who espouse a belief in the superiority of the white race.

In 2021, the FBI and DHS assessed RMVEs advocating the superiority of the white race and anti-authority or anti-government violent extremists, specifically militia violent extremists, presented the most lethal threat categories. The FBI and DHS assessed RMVEs were most likely to conduct mass-casualty attacks against civilians, and militia violent extremists would typically target law enforcement and government personnel and facilities. In 2021, at least four DT-related attacks resulted in 13 deaths. DVEs with mixed or personalized ideologies committed two of the four attacks. The other two lethal attacks were committed by RMVEs – one who advocated the

---

[4] The FBI defines a hate crime as a criminal offense that was motivated, in whole or in part, by the offender's bias against a person's actual or perceived race/ethnicity, national origin, gender, gender identity, religion, disability, and/or sexual orientation, and was committed against persons, property, or society.

superiority of the white race and one who allegedly used his interpretations of religious teachings to justify the murder of a police officer.

In 2021 and 2022, the FBI, DHS, and NCTC produced annual joint strategic intelligence assessments on domestic violent extremism. In March 2021, the agencies published an assessment titled, *Domestic Violent Extremism Poses Heightened Threat in 2021*. An unclassified summary of the assessment is available in Appendix B.[5] In June 2022, the agencies published a second joint assessment titled, *Wide-Ranging Domestic Violent Extremist Threat to Persist*. That assessment is unclassified and is available in Appendix C.

## V.  Discussion and Comparison of Investigative Activities

The Act calls for a discussion and comparison of the following activities:

- The criteria for opening, managing, and closing DT and international terrorism (IT) investigations.

- Standards and procedures for the FBI with respect to the review, prioritization, and mitigation of DT and IT threats in the United States.

- The planning, development, production, analysis, and evaluation of intelligence and intelligence products relating to terrorism, noting any differences with respect to DT and IT.

- The sharing of information relating to DT and IT by and between the federal government; SLTT and foreign governments; the appropriate Congressional committees; nongovernmental organizations; and the private sector.

- The criteria and methodology used by the FBI to identify or assign terrorism classifications to DT investigations.

- Compliance with privacy, civil rights, and civil liberties policies and protections, including protections against the public release of names or other personally identifiable information of individuals involved in incidents, investigations, indictments, prosecutions, or convictions for which data is reported under the Act.

- Information regarding any training or resources provided to assist federal and SLTT law enforcement agencies in understanding, detecting, deterring, and investigating acts of DT, including the date, type, subject, and recipient agencies of such training or resources.

---

[5] The agencies provided the full, classified version of the report to the appropriate Congressional committees in March 2021. The unclassified summary is also available on the ODNI's public website.

*Criteria for Opening, Managing, and Closing DT and IT Investigations*

**Opening**: The FBI opens a full investigation[6] predicated on an "articulable factual basis" that reasonably indicates the existence of federal criminal activity or a threat to national security, or to protect against such activity or threat. The opening of a full investigation must be approved by a Supervisory Special Agent and notice to the responsible Headquarters unit must be provided within 15 days of opening. The FBI may open a preliminary investigation[7] on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security.[8] The opening of a preliminary investigation by a Field Office requires the approval of a Supervisory Special Agent, but does not require notice to the DOJ, unless it involves a sensitive investigative matter (SIM).[9]

The opening of an investigation involving a SIM must be reviewed by the Field Office's Chief Division Counsel (CDC), approved by the Special Agent in Charge, and provided to the responsible Headquarters Unit Chief within 15 days of opening as notice. The Field Office must notify the USAO within 30 days unless inappropriate, and in that case, Headquarters must notify and provide an explanation to DOJ within 30 days.

No investigation may be opened based solely on activities protected by the First Amendment or the lawful exercise of rights secured by the Constitution or laws of the United States.

The opening of a preliminary or full investigation classified as a DT matter must be approved by the Field Office's CDC; however, the opening of a full investigation classified as an IT matter does not have the same requirement.

**Managing**: The *Attorney General's Guidelines for Domestic FBI Operations* (*AGG-Dom*) authorize all lawful investigative methods in the conduct of a full investigation. The FBI requires

---

[6] A full investigation may be opened if there is an "articulable factual basis" for the investigation that reasonably indicates one of the following circumstances exists: an activity constituting a federal crime or a threat to the national security has or may have occurred, or is or may be occurring, or will or may occur, and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity. An enterprise investigation is a type of full investigation that examines the structure, scope, and nature of the group or organization.

[7] A preliminary investigation is a type of predicated investigation that may be opened (predicated) on the basis of any "allegation or information" indicative of possible criminal activity or threats to the national security. Preliminary investigations may be opened to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security. Enterprise investigations cannot be conducted as preliminary investigations or assessments, nor may they be conducted for the sole purpose of collecting foreign intelligence.

[8] The significance of the distinction between the full and preliminary investigation is in the availability of investigative tools. A preliminary investigation, which is based on the lesser factual predicate, limits the investigative tools and methods available, while the full investigation, which is based on the more robust factual predicate, permits the full range of legally available investigative tools and methods. In some instances, cases opened as preliminary investigations may be converted to full investigations based on the development of additional facts during the course of the investigation.

[9] A sensitive investigative matter (SIM) involves the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), religious or political organization or individual prominent in such an organization, or news media, or any other matter which, in the judgment of the official authorizing an investigation, should be brought to the attention of FBI Headquarters and other DOJ officials.

file reviews of full investigations every 90 days. Some investigative methods the FBI is authorized to use differ between DT and IT investigations, based on the differences in statutory investigative authorities available in criminal matters, such as DT investigations, and in foreign intelligence matters, such as IT investigations. For example, a full investigation of a DT matter may conduct electronic surveillance, if authorized, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. A full investigation of an IT matter may also conduct electronic surveillance, as authorized, pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended. Additionally, investigations of DT and IT matters may make use of federal grand jury subpoenas to compel the disclosure of records and other relevant information, but investigations of IT matters may also use a National Security Letter[10] to compel defined categories of records from certain businesses. Finally, investigations of DT matters must be periodically reviewed by the Field Office's CDC, and investigations of IT matters do not have the same requirement.

**Closing**: A Supervisory Special Agent must approve the closure of both full and preliminary investigations. A preliminary investigation must be closed within six months of its opening but may be extended for an additional six months. At the conclusion of either type of investigation, each of the following items must be documented:

- A summary of the results of the investigation.

- Whether logical and reasonable investigation was completed.

- Whether all investigative methods/techniques initiated have been completed and/or discontinued.

- Whether all set leads have been completed and/or discontinued.

- Whether all evidence has been returned, destroyed, or retained in accordance with evidence policy.

- A summary statement of the reason the full investigation will be closed.

At the conclusion of a full investigation, the Field Office must also document whether sufficient personnel and financial resources were expended on the investigation, or an explanation/justification for not expending sufficient resources.

There are no substantive differences in how the FBI closes full investigations of DT or IT matters.

---

[10] A National Security Letter is an administrative demand for documents or records that are relevant to a predicated investigation to protect against international terrorism or clandestine intelligence activities.

The following chart presents a comparison of FBI policies for both DT and IT preliminary and full investigations.

| | PRELIMINARY INVESTIGATION | FULL INVESTIGATION |
|---|---|---|
| **PREDICATION** | Information or an allegation indicating the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) | Articulable factual basis that reasonably indicates the existence of federal criminal activity or a threat to national security (or to protect against such activity or threat) |
| **APPROVAL TO OPEN** | • Supervisory Special Agent (SSA) <br> • If a Domestic Terrorism (DT) matter, Field Office (FO) Chief Division Counsel (CDC) | • SSA <br> • Notice to the responsible Headquarters (HQ) unit must be provided within 15 days of opening <br> • If a DT matter, FO CDC |
| **APPROVAL TO OPEN: *SENSITIVE INVESTIGATIVE MATTER (SIM)*** | • FO CDC <br> • FO Special Agent in Charge (SAC) <br> • Notice to responsible HQ Unit Chief within 15 days of opening. <br> • Notice to the US Attorney's Office (USAO) within 30 days unless inappropriate, HQ must notify the Department of Justice (DOJ) within 30 days | • FO CDC <br> • FO SAC <br> • Notice to responsible HQ Unit Chief within 15 days of opening <br> • Notice to the USAO within 30 days unless inappropriate, HQ must notify DOJ within 30 days |
| **FILE REVIEW** | Every 90 calendar days | Every 90 calendar days |
| **EXAMPLES OF AUTHORIZED INVESTIGATIVE METHODS** | In a DT Matter: <br> • Obtain public information <br> • Physical surveillance <br> • Federal grand jury subpoenas <br><br> In an International Terrorism (IT) Matter: <br> • Obtain public information <br> • Physical Surveillance <br> • Federal grand jury subpoenas and National Security Letters (NSLs) | In a DT Matter: <br> • Obtain public information <br> • Physical surveillance <br> • Federal grand jury subpoenas <br> • Electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 <br><br> In an IT Matter: <br> • Obtain public information <br> • Physical Surveillance <br> • Federal grand jury subpoenas and NSLs <br> • Electronic surveillance pursuant to Foreign Intelligence Surveillance Act of 1978, as amended |
| **CLOSURE** | Must be closed within six months but may be extended for an additional six months | No duration limit |
| **APPROVAL TO CLOSE** | SSA <br> • Notice to the responsible HQ unit must be provided prior to closing | SSA <br> • Notice to the responsible HQ unit must be provided prior to closing |
| **APPROVAL TO CLOSE: *SIM*** | SSA, with SAC approval | SSA, with SAC approval |

### *Standards and Procedures for Reviewing, Prioritizing, and Mitigating DT and IT Threats*

The FBI uses the Threat Review and Prioritization (TRP) process as a standardized method for reviewing and prioritizing threats within operational programs to inform threat strategies, mitigation plans, and resource allocation. Headquarters operational divisions use the TRP process to uniformly define threat issues for the organization, determine their prioritization at the national level, establish FBI National Threat Priorities (NTPs), and develop national threat strategies for those threats to the FBI enterprise. Field Offices then cascade the results of the national-level TRP process to prioritize threat issues and create threat strategies to mitigate threats based on the threat landscape of their specific areas of responsibility (AORs). The FBI conducts the TRP process on a biennial basis, but it may be conducted annually at the discretion of the Field Office or Headquarters operational division head. For DT and IT threats, DOJ NSD's Counterterrorism Section (CTS) attorneys offer prosecutorial views during the national-level TRP process.

The TRP process seeks to build consensus, and includes applicable USAO(s) and stakeholders, such as NSD/CTS, to determine prioritization (banding) and to develop threat strategies for mitigation of threat issues. Headquarters operational divisions develop national threat strategies for each threat issue to guide enterprise-wide mitigation efforts. Field Offices develop threat strategies annually for all threat issues they band, and they detail the particular steps the Field Office plans to take to mitigate each banded threat issue in their AOR. These threat strategies must be used to guide mitigation of each threat issue for the upcoming fiscal year, unless a change in threat banding or threat strategies occurs during midyear negotiations. The TRP of the FBI is classified as it incorporates sources and methods as a basis of strategic alignment of national security resources.

There are no differences in how the FBI reviews and prioritizes DT and IT threats, and each threat issue is reviewed independently; however, the threat band dictates priorities within these programs. Investigative methods the FBI is authorized to use differ between DT and IT investigations, and DT investigations may be subject to additional legal review.

### *Planning, Development, Production, Analysis, and Evaluation of Intelligence and Intelligence Products Relating to DT and IT*

The FBI intelligence cycle for both DT and IT matters consists of planning intelligence efforts around priorities based on national or Field Office threat strategies, collecting raw intelligence information, processing and synthesizing data, analyzing and crafting assessments into analytic intelligence products, disseminating those products, briefing analysis to decision makers, and evaluating disseminated products and the production process to inform future efforts.

Similarly, DHS began Intelligence Threat Banding in 2019, a process in which DHS intelligence leadership, as part of the Homeland Security Intelligence Council (HSIC), prioritizes threat topics. The process is informed by DHS's execution of the intelligence cycle – the development of requirements, collection through field operations or open source collectors, and analysis to produce finished intelligence in the DT space.

DHS implements Intelligence Threat Banding across its mission areas. The results are used to inform and drive the Department's collection and analysis efforts for maximum impact against the "high banded" topic areas; develop cross component programs, projects, and activities; and inform intelligence resource allocation decisions.

During the planning phase of the intelligence cycle, both the FBI and DHS consider the National Intelligence Priorities Framework, which documents the U.S. Intelligence Community's priorities; the FBI also considers its own standing intelligence and investigative responsibilities, which are addressed and prioritized in the TRP process. During the TRP process, the FBI identifies the intelligence needs related to the threat priorities, and those intelligence needs drive the subsequent stages of the intelligence cycle. Meanwhile, DHS also addresses any additional priorities and/or requirements identified by the Secretary of Homeland Security or the Under Secretary of Homeland Security for Intelligence and Analysis, the latter of whom serves as the DHS Chief Intelligence Officer.

During the collection and processing phases of the intelligence cycle, both the FBI and DHS obtain raw intelligence from lawful collection methods consistent with their respective authorities and then synthesize this data into a form intelligence personnel can use. In the analysis and evaluation phases, analysts examine and evaluate all source intelligence, including collected information; add context, as needed; and integrate the information into complete assessments. The analysts make assessments about the implications of the information for the United States and document the assessments in analytic intelligence products.

Legal review is required for any FBI intelligence product, such as an Intelligence Information Report (IIR),[11] related to a potential SIM or other sensitive information, in accordance with the guidelines in the FBI's *Domestic Investigations and Operations Guide* (DIOG) and identified "legal review triggers." One such legal review trigger is information related to DT. Similarly, all of DHS's finished intelligence products undergo a rigorous legal, privacy, civil rights and civil liberties review process, as well as intelligence oversight review prior to dissemination outside DHS to help ensure the rights of U.S. persons are protected.

Finally, intelligence analysis is disseminated in either a written intelligence product or a verbal briefing during the production phase. Intelligence analysis customers for both FBI and DHS include leadership, policymakers, military leaders, other federal and SLTT government officials, private sector partners, and operational counterparts who then make decisions informed by that information. For DHS, the Homeland Security Information Network-Intelligence is the primary means for disseminating unclassified DHS raw intelligence reporting and finished intelligence products to authorized federal, SLTT, and private sector partners.

---

[11] An Intelligence Information Report (IIR) is the FBI's primary document used to share raw, non-compartmented FBI intelligence information.

***Sharing of Information Relating to DT and IT***

The FBI's *National Strategy for Information Sharing and Safeguarding* provides the common vision, goals, and framework needed to guide information sharing initiatives with our federal and SLTT partners, foreign government counterparts, and private sector stake holders. The FBI shares information consistent with the Privacy Act, FBI policy, and any other applicable laws and memoranda of understanding or agreement with other agencies.

The FBI works closely with our federal and SLTT law enforcement partners to investigate and disrupt both DT and IT. The FBI also has a strong working relationship with DOJ's CTS which, as of June 2022, includes a Domestic Terrorism Unit.

Drawing on expertise across NSD and the DOJ more broadly, the Domestic Terrorism Unit has several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. This structure preserves flexibility, while allowing CTS to better support the FBI, which has dedicated teams for handling DT and IT matters. We recognize that countering DT must be a whole-of-Department effort. To that end, the unit will include liaisons from components outside of NSD, including the Civil Rights Division and the Tax Division, among others, to marshal Department-wide expertise and resources and offer a mechanism for DOJ components to assess collaboratively and bring to bear all available tools to hold violent extremists accountable. We also leverage the strong work by our SLTT law enforcement partners. The unit will engage in outreach to these partners to share lessons learned, increase information sharing, and ensure that we are bringing all available tools – state and federal – to bear against violent extremism.

The front line of the counterterrorism mission in the United States is the FBI-led Joint Terrorism Task Forces (JTTFs). The FBI maintains about 56 JTTFs nationwide spanning over 100 locations, with representation in all 56 FBI Field Offices and satellite Resident Agencies. The JTTFs have participation of over 50 federal and over 500 SLTT agencies. These relationships are critical to effective information sharing and the leveraging of local expertise and experience in FBI investigations. The FBI also shares intelligence products with federal and SLTT partners as appropriate to inform them of the current threat environment and these products are posted on portals like the Law Enforcement Enterprise Portal.

The FBI and DHS, in coordination with NCTC, produce Joint Intelligence Bulletins (JIBs) and other products that communicate updated threat information and assessments to our federal and SLTT partners at the Unclassified//For Official Use Only (FOUO) or Law Enforcement Sensitive (LES) levels. JIBs alert our partners to significant arrests – including those accomplished through collaboration among different law enforcement entities – and trends we have observed in both the DT and IT arenas. Additionally, beginning in early 2022, the FBI, DHS, and NCTC began producing tri-seal domestic violent extremism-focused intelligence products under the auspices of a Joint Analytic Cell (JAC). The JAC ensures close collaboration among the three agencies to provide more data-informed strategic analysis of the DT threat environment and better inform policymakers and state and local law enforcement agencies of changes in the threat landscapes.

DHS products within the DT and IT spaces are shared with authorized federal, SLTT, and private sector partners, including the National Network of Fusion Centers, private sector security officials, and other customers. For those operating at primarily the unclassified level, products at the FOUO and LES levels are shared via the Homeland Security Information Network.

### *Criteria and Methodology to Identify or Assign Terrorism Classifications to FBI DT Investigations*

While classifications, or categories, help the FBI better understand the criminal actors we pursue, we recognize actors' motivations vary, are nuanced, and sometimes are derived from a blend of socio-political goals or personal grievances. Regardless of the classification, the FBI follows the facts and evidence of the case to carry out our investigations. Currently, the U.S. government broadly refers to the DT threat by using the following threat categories, which are further defined in the "Definitions, Terminology and Methodology" section of this report: (1) Racially or Ethnically Motivated Violent Extremism; (2) Anti-Government or Anti-Authority Violent Extremism; (3) Animal Rights/Environmental Violent Extremism; (4) Abortion-Related Violent Extremism; and (5) All Other Domestic Terrorism Threats.

In addition to conducting investigative activity in response to the DT threats described above, the FBI also conducts civil unrest and anti-riot investigations under its DT Program. The FBI conducts civil unrest investigations to address violations of federal criminal law involving a civil disturbance. The FBI conducts anti-riot investigations to address violations of federal criminal law in which an individual uses force or violence during a public gathering. For both civil unrest and anti-riot investigations, the FBI provides information or assistance to other federal, state, or local authorities.

### *Compliance with Privacy, Civil Rights, and Civil Liberties Policies and Protections*

The FBI is responsible for protecting the security of our Nation and its people from crime and terrorism while maintaining rigorous obedience to the Constitution and compliance with all applicable statutes, regulations, and policies. The *AGG-Dom* establishes a set of basic principles that serve as the foundation for all FBI mission-related activities. These principles demonstrate respect for civil liberties and privacy as well as adherence to the Constitution and laws of the United States.

One of the most important principles in the *AGG-Dom* is the threshold requirement that all investigative activities be conducted for an authorized purpose, which under the *AGG-Dom* means an authorized national security, criminal, or foreign intelligence collection purpose. The authorized purpose must be well-founded and well-documented; and the information sought and investigative method used to obtain it must be focused in scope, time, and manner to achieve the underlying purpose.

The *AGG-Dom* authorizes all lawful investigative methods in the conduct of a full investigation. These methods, which range in intrusiveness, consider the effect on the privacy and civil liberties

Page **14** of 45

of individuals and the potential to cause harm to, or otherwise damage the reputation of individuals. According to policy, the least intrusive method should be used, based upon the circumstances of the investigation, but the FBI may use any lawful method consistent with the *AGG-Dom*. A more intrusive method may be warranted in light of the seriousness of a criminal or national security threat or the importance of a foreign intelligence requirement, and the options available to obtain the intelligence, information, or evidence

By emphasizing the use of the least intrusive means to obtain intelligence, information, or evidence, FBI employees can effectively execute their duties while mitigating the potential negative impact on the privacy and civil liberties of all people encompassed within the investigation, including targets, witnesses, and victims.

As a matter of FBI policy, law enforcement activities within the scope of DT investigations are particularly subject to close internal legal review and supervisory approvals to ensure constitutional rights, privacy, and civil liberties are protected at each juncture. DT investigations undergo numerous legal reviews due to the likelihood these investigations may touch upon First Amendment-protected activities, and/or other Constitutional rights, civil liberties and privacy-related considerations.

DHS is steadfastly committed to the highest standards of conduct across the Department, especially when it comes to the equitable and transparent enforcement of our laws. DHS's intelligence activities within the terrorism space are governed by DHS's *Intelligence Oversight Guidelines*, which were approved by the Attorney General in 2017. These guidelines reflect DHS's legal authorities as well as legal and policy protections for privacy, civil rights, and civil liberties. Countering domestic violent extremism is a vital part of the Department's broader obligation to help ensure the security of our Nation, and DHS recognizes that mission can succeed only if the Department respects and protects the values of the Nation. DHS prioritizes rigorous safeguarding civil rights, civil liberties, and individual privacy protections across all its domestic counterterrorism efforts, including those related to countering DT.

In confronting the threat of domestic violent extremism, DHS focuses on potential criminal activity. It does not engage in any intelligence activity for the sole purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, or for the purpose of retaliating against a whistleblower or suppressing or burdening criticism or dissent. Further, DHS policy also prohibits the consideration of race or ethnicity in its intelligence, investigative, screening, or law enforcement activities in all but the most exceptional instances. Additionally, how DHS identifies and detects DT requires faithful adherence to fair information practice principles and privacy-focused departmental policies. DHS always incorporates privacy protections in information technology systems, technologies, rulemakings, programs, pilot projects, and other activities that involve the planned use of personally identifiable information. DHS's Office for Civil Rights and Civil Liberties, Privacy Office, and Office of the General Counsel are involved in all of its counterterrorism and prevention missions, and DHS-I&A's intelligence activities are further reviewed by its internal Privacy and Intelligence Oversight Branch. These offices continue to help oversee and train DHS intelligence personnel on how to respect the privacy, civil rights, and civil liberties of all people and communities.

The NCTC ensures its analytic work addressing the domestic violent extremism threat in support of the FBI and DHS is fully consistent with the NCTC's authorities and undertaken in accordance with the *ODNI Intelligence Activities Procedures Approved by the Attorney General Pursuant to Executive Order 12333* (*ODNI Guidelines*) for the protection of U.S. person[12] information. The NCTC has issued procedures to implement the *ODNI Guidelines* requirements and established additional prudential safeguards to inform the Center's domestic counterterrorism intelligence activities. These safeguards include prior supervisory approval and completion of training on domestic counterterrorism authorities prior to undertaking queries designed to retrieve domestic counterterrorism intelligence. The NCTC's domestic counterterrorism support to the FBI and DHS focuses on trends and transnational threats, and when assessing individual actors, NCTC relies on FBI and DHS determinations of whether specific individuals are DVEs. Legal and privacy, civil rights, and civil liberties officers advise on all aspects of the analytic production process and NCTC has integrated their review of domestic violent extremism products into its publication processes. The NCTC is not authorized to and does not collect, access, obtain, or maintain information concerning U.S. persons solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States.

### *Training or Resources Provided to Federal, State, Local, and Tribal Law Enforcement Agencies*

The FBI takes a leadership role in identifying and addressing emerging threats, and as such, actively engages with its federal and SLTT law enforcement partners through the JTTFs. The FBI shares and encourages the sharing of intelligence and participates in multi-agency command posts to ensure maximum coordination. In order to proactively address threats, especially during ongoing incidents, the FBI has developed and shared best practices that are implemented across the nation.

The FBI's Behavioral Threat Assessment Center (BTAC), housed within the FBI's Critical Incident Response Group, supports JTTFs as well as state and local law enforcement partners by providing operational support in the form of tailored threat management strategies. In addition to operational support for pending threat investigations, the BTAC also trains on lessons learned from operational experience and research to better aid in prevention efforts. The BTAC is leading an unfunded national Threat Assessment and Threat Management (TATM) initiative to organize, coordinate, and synchronize an enterprise-wide strategy, which endeavors to build and develop stronger partnerships between law enforcement and across all levels of government with local mental health practitioners and other relevant stakeholders, in an effort to prevent acts of terrorism and targeted violence.

---

[12] Executive Order 12333 defines a U.S. person as a U.S. citizen, an alien known by the intelligence element concerned to be a permanent resident alien, an unincorporated association substantially composed of U.S. citizens or permanent resident aliens, or a corporation incorporated in the United States, except for a corporation directed and controlled by a foreign government or governments.

The FBI's BTAC has established designated Threat Management Coordinators (TMC) in each Field Office, provided advanced training to 115 TMCs, and commenced training of FBI Task Force Officers to work as liaison counterparts within state and local governments. The BTAC and local Field Office TMCs have identified 12 active local or regional TATM teams with FBI participation, and an additional five FBI-led TATM teams. The 12 local/regional teams are in/around and have participation from FBI Field Offices in Baltimore, Buffalo, Las Vegas, Los Angeles, Miami, Minneapolis, New Haven, New York, Phoenix, Pittsburgh, San Antonio, and Washington, DC; the five FBI-led teams are run by the FBI Boston, Denver, Honolulu, Oklahoma City, and Philadelphia Field Offices.

In 2021, the FBI, DHS, and NCTC jointly updated the booklet, *U.S. Violent Extremist Mobilization Indicators*, which contains observable indicators to help bystanders or observers recognize behaviors that may indicate mobilization to violence. Unlike prior editions – which focused entirely on foreign terrorist-inspired homegrown violent extremists – the 2021 edition was expanded to include indicators that apply across U.S.-based ideologically motivated violent extremists, including indicators validated as relevant for DVEs.[13] The booklet was published to help law enforcement and first responder partners and the public at large recognize potentially dangerous behaviors to help identify terrorists before they conduct deadly attacks. It is important to note some behavioral indicators may relate to Constitutionally-protected or otherwise lawful activities. Law enforcement action should never be taken solely on the basis of Constitutionally-protected activities; therefore, the FBI considers the totality of the circumstances in determining whether there is a lawful basis for investigative activity.

The FBI also maintains the eGuardian system as a resource to facilitate sharing of suspicious activity reports for terrorism or other threat related information by federal and SLTT law enforcement agencies, to include over 70 state and local fusion centers, and the Department of Defense. Currently, eGuardian is used in all 50 states, four US Territories, and the District of Columbia.

Specific to formalized training, the FBI offers the Counterterrorism Baseline Operational Learning Tool (CT BOLT) course to all new counterterrorism employees, including Task Force Officers supporting the JTTFs. In addition to operational training and instruction, the course provides training on applicable privacy and civil liberties law and policy and the fundamentals of protecting First Amendment rights during the course of FBI investigations. The FBI conducts the CT BOLT course on a monthly basis, and during 2020 and 2021, more than 500 students completed the course.

DHS's National Threat Evaluation and Reporting Program (NTER), established in 2019, serves as a joint collaborative effort by the DHS and federal and SLTT partners that builds on the success of the Nationwide Suspicious Activity Reporting (SAR) Program. It provides law enforcement and homeland security partners with additional resources and training to help identify and prevent targeted violence and mass casualty incidents implicating homeland security, including those associated with terrorism, as well as facilitating a national capacity for

---

[13] The 2021 edition served as an update to a prior version published in 2019, and it was published on the ODNI's public website.

identifying, evaluating, and reporting, and sharing tips and leads related to those threats. NTER is the program and training lead for the Nationwide SAR Initiative (NSI) to assist partners in reporting and sharing suspicious activity and is arranging a review of the NSI SAR pre-operational behavioral categories through the lens of domestic violent extremism and targeted violence. The NTER's Master Trainer Program trains homeland security partners to assist their local communities in adapting to an evolving threat landscape. Master Trainers teach behavioral threat assessment techniques and best practices to local partners, and are equipped to empower SLTT partners to identify and assess risk and warning signs, and manage potential threats of future, targeted violence regardless of motive.

The DHS Office for State and Local Law Enforcement (OSLLE) is a headquarters-level organization that was created on the recommendation of the 9/11 Commission. OSLLE's mission is to lead DHS coordination, liaison, and advocacy for SLTT and campus law enforcement by building and cultivating strong partnerships. The office executes its mission by sharing timely and pertinent information and resources with SLTT and campus partners; advising the Secretary and DHS components on the issues, concerns, and recommendations of SLTT and campus law enforcement during policy, program, and initiative development; and ensuring that DHS law enforcement and terrorism focused grants are appropriately focused on terrorism prevention activities. To efficiently and effectively share many of the resources readily available to SLTT and campus law enforcement, including training and grant opportunities, OSLLE maintains the DHS Law Enforcement Resource Guide,[14] and works to share these resources with SLTT campus law enforcement and other related stakeholders through various forums. When a SLTT and campus law enforcement request for resources cannot be fulfilled by existing DHS resources, OSLLE works with intra- and interagency partners to develop customized solutions.

The U.S. Secret Service National Threat Assessment Center (NTAC) is authorized by the Presidential Threat Protection Act of 2000 (Pub. L. 106-544) to conduct research, training, and consultation on threat assessment and the prevention of targeted violence. NTAC is comprised of a multidisciplinary team of social science researchers and regional program managers who support and empower our partners in law enforcement, schools, government, and other public and private sector organizations to combat the ever-evolving threat of targeted violence impacting communities across the United States. NTAC publishes operationally relevant research examining all forms of targeted violence and produces guides for establishing proactive, targeted violence prevention programs. NTAC staff provide training on threat assessment and the prevention of targeted violence, by request, to public safety audiences, which often include SLTT law enforcement, schools, universities, and other agencies and organizations with public safety responsibilities. NTAC is authorized to provide consultation on the development of threat assessment policies and protocols, as well as on complex threat assessment cases.

## VI.  Data on Domestic Terrorism

The Act calls for annual updates to the following data and information, and this report provides two years of annual updates, to include data and information for 2020 and 2021:[15]

---

[14] Available via: https://www.dhs.gov/sites/default/files/2022-04/22_0407_OSLLE_LE-resource-guide-signed_508.pdf.
[15] For data related to investigations, DHS defers to the FBI.

- For each completed or attempted DT incident that has occurred in the United States: a description of such incident; the date and location of such incident; the number and type of completed and attempted federal nonviolent crimes committed during such incident; the number and type of federal and state property crimes committed during such incident, including an estimate of economic damages resulting from such crimes; and the number and type of complete and attempted federal violent crimes committed during such incident, including the number of people killed or injured as a result of such crimes.

- An identification of each assessment,[16] preliminary investigation, full investigation, and enterprise investigation with a nexus to DT opened, pending, or closed by the FBI; and the number of assessments, preliminary investigations, full investigations, and enterprise investigations associated with each DT investigative classification.

- The number of assessments, preliminary investigations, full investigations, and enterprise investigations with a nexus to DT initiated as a result of a referral or investigation by a federal, SLTT, or foreign government of a hate crime.

- The number of federal criminal charges with a nexus to DT, including the number of indictments and complaints associated with each DT investigative classification; a summary of the allegations in each such indictment; the disposition of the prosecution; and, if applicable, the sentence imposed as a result of a conviction on such charges.

- Referrals of DT incidents by or to SLTT or foreign governments, to or by departments or agencies of the federal government, for investigation or prosecution, including the number of such referrals associated with each DT investigative classification, and a summary of each such referral that includes the rationale for such referral and the disposition of the applicable federal investigation or prosecution.

- The number of intelligence products associated with each DT investigative classification.

- With respect to the FBI, the number of staff working on DT matters and a summary of time utilization by and recordkeeping data for personnel working on such matters, including the number or percentage of such personnel associated with each DT investigative classification in the FBI's Headquarters Operational Divisions and Field Divisions.

- With respect to the DHS I&A, the number of staff working on DT matters.

- With respect to the NCTC, the number of staff working on DT matters and the applicable legal authorities relating to the activities of such staff.

---

[16] An assessment is an investigative activity, which requires an authorized purpose and articulated objective(s). Assessments may be carried out to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence.

*Completed or Attempted DT Incidents in the United States*

Appendix A provides information that represents significant DT incidents and disrupted plots that have occurred in the United States during 2020 and 2021. Many DT incidents are rooted in state and local level criminal activity, and there is currently no mandatory incident reporting requirement for these incidents to be reported to the federal government.

*Identification and Number of Each FBI DT Investigation*

As of the end of FY 2020, the FBI was conducting approximately 1,400 pending DT investigations; and as of the end of FY 2021, the FBI was conducting approximately 2,700 DT investigations. A significant portion of the FY 2021 investigations were directly related to the unlawful activities during the January 2021 siege on the U.S. Capitol. The following table presents the percentage breakout of DT investigations by investigative classification as of the end of FY 2020 and FY 2021.

| Percentage Breakout of FBI Domestic Terrorism Investigations by Investigative Classification | | |
|---|---|---|
| Investigative Classification | End of FY 2020 | End of FY 2021 |
| Racially or Ethnically Motivated Violent Extremism | 40% | 19% |
| Anti-Government or Anti-Authority Violent Extremism | 37% | 38% |
| Animal Rights/Environmental Violent Extremism | 1% | 1% |
| Abortion-Related Violent Extremism | 1% | 0% |
| All Other DT Threats | 4% | 11% |
| Anti-Riot Laws/Civil Unrest | 17% | 31% |

*Identification of FBI DT Assessments and Investigations as a Result of a Hate Crime*

Hate crimes violations and DT are not mutually exclusive. A hate crime is targeted violence motivated by the offender's bias against a person's actual or perceived characteristics, while a DT incident involves acts dangerous to human life that are in violation of criminal laws and in furtherance of a social or political goal. The FBI's Domestic Terrorism-Hate Crimes Fusion Cell help to address the intersection of the FBI counterterrorism and criminal investigative missions to combat DT and provide justice to those who are victims of hate crimes.

The Hate Crime Statistics Program of the FBI's Uniform Crime Reporting (UCR) Program collects data regarding criminal offenses that were motivated, in whole or in part, by the offender's bias against a person's actual or perceived race/ethnicity, gender, gender identity, religion, disability, or sexual orientation, and were committed against persons, property, or

society. The FBI publishes an annual report of hate crime statistics, and in 2020, law enforcement agencies participating in the UCR Program reported 8,263 hate crime incidents.[17]

While the FBI collects and reports hate crime statistics, there is no mandatory reporting requirement to identify hate crime incidents that would also be considered criminal activity that appears to be motivated by a socio-political goal consistent with the DT threat categories. In instances of a potential hate crime, the FBI will open a civil rights investigation. If throughout the investigation a DT ideology is identified, the Criminal Investigative Division and Counterterrorism Division will work together through the Domestic Terrorism-Hate Crimes Fusion Cell to determine the best path forward. This may include, but is not limited to, converting the investigation to a DT case, assigning a DT agent to the case, or developing regular communication between the two programs. In cases involving DVEs, where a potential hate crime is identified, the Counterterrorism Division's DT Program will coordinate with the Criminal Investigative Division's Civil Rights Program and the local USAO to assess the potential for a hate crimes charge. In certain instances, based on the specific context of the investigation, parallel DT and hate crimes cases will be opened.

### *Number of Federal Charges with a DT Nexus*

A litany of federal and state charges are used to charge DT subjects for applicable criminal violations. Federal charges include those related to weapons, explosives, threats, attacks on federal officials or facilities, hate crimes, arson, violence against animal enterprises, and material support to terrorists. Under 18 U.S.C. § 2339A, it is a crime to provide material support or resources to another knowing or intending they will be used in preparation for or carrying out certain terrorism-related offenses. Unlike a violation of 18 U.S.C. § 2339B, the recipient of the material support need not be a designated foreign terrorist organization.

In FY 2020, the FBI, often in coordination with partner agencies, arrested approximately 180 DT subjects. In FY 2021, the FBI, often in coordination with partner agencies, arrested approximately 800 DT subjects.[18]

Individuals whose conduct involves DT or a threat thereof may be prosecuted by any USAO under a wide range of criminal statutes, some of which on their face relate to DT, and others of which do not.[19] While the criminal code includes a definition of DT, *see* 18 U.S.C. § 2331(5), there is no standalone federal DT statute. For example, the DOJ has prosecuted cases against

---

[17] The FBI's *Hate Crime Statistics, 2020*, released fall 2021. As of the date of this report, the FBI has not yet published the annual report for 2021.

[18] A significant portion of arrests of DT subjects in FY 2021 were related to the unlawful activities during the January 2021 siege on the U.S. Capitol.

[19] Several statutes reach conduct that may be associated with terrorism, without regard to whether the offense itself involves domestic or international terrorism. These include statutes relating to aircraft sabotage, id. § 32; weapons of mass destruction, e.g., id. §§ 175, 175b, 175c, 229, 831, 832, 2332a, 2332h, 2332i; arson and bombing of federal property, e.g., id. §§ 844, 2332a, 2332f; and causing injury or death to a federal official, e.g. id. §§ 111, 115, 351, 1114, 1751; among others. It is also a crime to provide material support or resources to another knowing or intending that they be used in preparation for or carrying out certain terrorism-related offenses. Id. § 2339A.

such individuals using weapons charges, e.g., 18 U.S.C. §§ 922, 924; charges relating to use or possession of explosives, e.g., 26 U.S.C. §§ 5845, 5861; threat, hoax, or riot charges, e.g., 18 U.S.C. §§ 871, 875, 876, 1038, 2101; and charges proscribing attacks on federal officials or facilities, e.g., id. § 111, 115, 351, 844, 930, 1114, 1361, 1751. DOJ has also prosecuted cases involving DT using the material support to terrorist activity statute at 18 U.S.C. § 2339A. Hate crimes charges, e.g., id. § 249, may be appropriate where individuals engage in DT that is motivated by biases against a race, religion, ethnicity, or other specified factors. However, not all hate crimes cases involve DT. Arson, id. § 844, or specific charges relating to violence against animal enterprises, id. § 43, may apply to animal rights/environmental violent extremists. In some cases, drug trafficking, tax, or state and local charges could also provide a lawful basis to disrupt an individual believed to be planning or pursuing acts of DT. Finally, in some DT cases, DOJ seeks the use of the terrorism sentencing enhancement.[20]

DOJ recognizes the need for coordination and consistency in DOJ/FBI efforts to hold accountable DVEs who engage in criminal conduct. An important part of achieving those goals is to have the ability to identify and internally track investigations and prosecutions involving conduct related to domestic violent extremism, and the Department is implementing changes that will allow us to better identify and track such cases. In March 2021, the Acting Deputy Attorney General issued guidance to all USAOs to provide information to NSD on DT investigations and prosecutions. This directive not only highlighted the need for effective coordination, but also implemented a plan for better tracking of the important DVE-related work being done by federal investigators and prosecutors around the country.

### *Referrals of DT Incidents to the FBI*

The eGuardian system is the FBI's case management system for handling suspicious activity reports from federal and SLTT law enforcement agencies and the Department of Defense related to counterterrorism, counterintelligence, cyber incidents, criminal complaints, and weapons of mass destruction. These reports are then migrated to the FBI's internal Guardian system where it is further evaluated by the appropriate squad or JTTF for any action deemed necessary.

In FY 2020, the FBI received approximately 5,669 referrals of possible DT incidents; and in FY 2021, the FBI received approximately 8,375 referrals of possible DT incidents.

In FY 2020, the FBI referred approximately 1,287 possible DT incidents to federal and/or SLTT partners. In FY 2021, the FBI referred approximately 1,399 possible DT incidents to federal and/or SLTT partners. The FBI refers incidents to partner agencies for multiple reasons. For example, the incident may not have a federal criminal nexus or the incident may be the statutory

---

[20] The Sentencing Guidelines provide a significant sentencing enhancement for offenses that involve, or are intended to promote, a "federal crime of terrorism"—often increasing the guideline range to the statutory maximum." *See* USSG § 3A1.4. "The Sentencing Guidelines also provide for a similar upward departure for other offenses that were calculated to influence or affect the conduct of government by intimidation or coercion, to retaliate against government conduct, or to intimidate or coerce a civilian population." *See id.* cmt. n.4.

responsibility of another law enforcement organization. In addition, the FBI may refer an incident to a partner agency, but continue to investigate the incident jointly.

In FY 2020, the FBI converted approximately 747 Guardian incidents to preliminary or full DT investigations. In FY 2021, the FBI converted approximately 1,525 Guardian incidents to preliminary or full DT investigations.

### DT Intelligence Products

From FY 2020 through FY 2021, the FBI produced approximately 6,000 DT-related intelligence products. A single intelligence product often contains threat reporting or case information from subjects associated with multiple investigative classifications, and as such, the FBI does not have the data to determine the number of intelligence products associated with each DT investigative classification. FBI intelligence products incorporate collection, domain, targeting, or threat analysis and are written at the tactical, operational, and strategic levels. FBI intelligence products are prepared for both internal and external audiences.

From FY 2020 through FY 2021, I&A has produced over 500 DT-related raw intelligence reports (IIRs, Open Source Intelligence Reports, and Field Intelligence Reports) and produced, jointly produced, or contributed to approximately 100 finished intelligence products related to DT, with the majority of these products released at the Unclassified//FOUO level to better inform SLTT partners. The finished intelligence products are available to appropriate Congressional partners via CapNet.

### Number of Staff Working DT Matters

One of the FBI's most vital assets in the counterterrorism fight is our ability to remain agile in combatting the threats we face. Staffing for the FBI's counterterrorism mission is aligned based on threat priorities and, as is true across the FBI, can and does realign in response to the evolution of the threats and any critical incidents.

The front line of the counterterrorism mission in the United States is represented by the FBI-led JTTFs, which investigate both DT and IT matters. The FBI leads approximately 56 JTTFs spanning over 100 locations nationwide and across all 56 Field Offices, including our satellite Resident Agencies, with participation of over 50 federal and over 500 SLTT agencies. The JTTFs are comprised of approximately 4,400 investigators, including FBI Special Agents and Task Force Officers, and additional analysts and professional staff who support these JTTF members and the investigations they lead. The JTTF partnerships at the federal and SLTT levels are force multipliers as they leverage local expertise, experience, and resources in FBI counterterrorism investigations.

In FBI Field Offices, squads are dedicated to the counterterrorism mission and not necessarily assigned specifically to investigate DT or IT matters. This is significant because the motivation behind an alleged threat or act of terrorism may not be immediately apparent. Additionally, when

an incident occurs, Field Office personnel from all operational programs – for example, criminal or counterintelligence – may respond.

Similar to our posture against the IT threat, the FBI's Counterterrorism Division at Headquarters has a dedicated Domestic Terrorism Operations Section (DTOS), comprised of Special Agents, Intelligence Analysts, and Professional Staff. The FBI's DTOS oversees and provides operational support to all 56 Field Offices and their Resident Agencies in investigating the use of violence by individuals to further social or political goals in violation of federal criminal statutes. The DTOS oversees the Domestic Terrorism-Hate Crimes Fusion Cell, which creates more opportunities for investigative creativity, provides multi-program coordination, helps ensure seamless information sharing, and enhances investigative resources to combat the DT threat.

The FBI's Counterterrorism Division also has specialized intelligence and targeting units that work to combat DT specifically, as well as additional units that provide support across the FBI's counterterrorism mission, not exclusive to DT or IT matters. The FBI conducts national-level strategic analysis of the DT threat through the Counterterrorism Analysis Section. This dedicated body of Intelligence Analysts focuses on providing strategic assessments of the IT and DT threat and actively works with DHS and NCTC to provide accurate intelligence on the threat picture. Further, all FBI counterterrorism investigations are led by the same Counterterrorism Division Deputy Assistant Director for Operations, who has a unique vantage point from which to assess the terrorism threat around the globe and prioritize investigations and operations across the country. Additionally, the FBI's Office of the General Counsel employs in-house attorneys within the National Security and Cyber Law Branch that are dedicated to providing legal assistance on DT operations at FBI Headquarters. This aligns with the legal counsel represented in all 56 FBI field offices.

As indicated above, DOJ/NSD also recently established a Domestic Terrorism Unit within the CTS that has several functions: prosecuting and coordinating DT cases, developing training and policies on DT matters, and supporting the work of the Department in implementing a whole-of-government strategy on countering DT. The Department believes that this change best enables us to respond to the evolving and persistent DT threat.

DHS I&A's Counterterrorism Mission Center (CTMC) leads I&A's analysis of DT issues. CTMC provides intelligence support and analysis that focuses on domestic threat actors, including DVEs, consistent with the Department's statutory charges to identify priorities for protective and support measures regarding terrorist and other threats to homeland security. In 2021, I&A created a Domestic Terrorism Branch, housed within CTMC, consisting of intelligence personnel solely dedicated to focusing on the DT landscape. These analysts have enabled I&A to increase its production and sharing of information on DT threats, engagement with FBI and NCTC counterparts to jointly author strategic DT intelligence products, and interactions with subject matter experts outside government. This branch currently consists of nine full time employees and one manager. Additionally, I&A maintains a presence at state and local fusion centers through its Office of Regional Intelligence,[21] and I&A analysts at DHS

---

[21] The Office of Regional Intelligence was formerly the Field Operations Division.

Headquarters work with those individuals to author joint products on issues relevant to their regions, including domestic violent extremism and physical threats to critical infrastructure.

In addition, I&A's Current and Emerging Threat Center maintains a small team of open source intelligence collectors to monitor and report on publicly available information sources online within the DT space, consistent with I&A's *Intelligence Oversight* Guidelines.

I&A's Office of Regional Intelligence has approximately 120 personnel deployed to field locations across the United States, primarily in state and local fusion centers. These officers work across a range of threat issues and actors, including the DVE mission space. I&A's field-deployed officers collect and report intelligence information in serialized raw intelligence reports and provide regionally-focused analysis, which may include DVE topics.

All of the DHS staff mentioned are specific to I&A, in accordance with the reporting requirements. Similar to FBI, DHS has added personnel and resources to counter DT in response to the evolution of the threat and to support the implementation of the June 2021 *National Strategy for Countering Domestic Terrorism*. These personnel span the breadth and depth of the DHS mission set, including but not limited to DHS representatives to JTTFs. DHS is the largest and longest standing federal contributor to the JTTFs nationwide and those personnel are closely involved with countering DT through the JTTFs.

While NCTC's primary missions are focused on the threat posed by IT, the Center provides domestic counterterrorism support, where appropriate, to the FBI and DHS, which are the lead domestic counterterrorism agencies. The NCTC identifies and monitors international and transnational trends across a range of violent extremist actors, and its primary role in providing domestic counterterrorism support to the FBI and DHS is to look for and analyze transnational linkages. Domestically, the NCTC provides domestic counterterrorism support to the FBI and DHS consistent with its legal authorities and *ODNI Guidelines,* which include protection for privacy, civil rights, and civil liberties of U.S. persons. NCTC's analytic coverage of domestic violent extremism topics, specifically, amounts to a small fraction of its broader counterterrorism portfolio. NCTC does not have analysts focused exclusively on domestic violent extremism threats.

## VII. Recommendations

The Act requires the Director of the FBI and the Secretary of Homeland Security, in consultation with the DNI, to jointly submit to the appropriate Congressional committees a report on DT containing recommendations with respect to the need to change authorities, roles, resources, or responsibilities within the federal government to more effectively prevent and counter DT activities, and measures necessary to ensure the protection of privacy and civil liberties.

### *Implementation of the National Strategy for Countering Domestic Terrorism*

In June 2021, the White House released the first-ever *National Strategy for Countering Domestic Terrorism*, which provides a government-wide strategy to counter domestic violent extremism.

The national strategy references the March 2021 U.S. Intelligence Community intelligence assessment titled, *Domestic Violent Extremism Poses Heightened Threat in 2021*, and lays out a comprehensive strategy to address the DT threat, building on a foundation of U.S. government collaboration on programmatic aspects of countering DT – such as information sharing, training, prevention, and intervention efforts – while fostering a broader community that extends beyond the U.S. government to critical partners. The national strategy also reinforces the U.S. government's commitment to approaching this important work while avoiding unlawful discrimination, bias, and stereotyping and the protection of American civil rights and civil liberties, including preserving and safeguarding constitutionally protected freedom of speech and association, while focusing on addressing unlawful violence. The strategy also includes prevention efforts to enhance community resilience against domestic terrorism and the provision of available resources.

The FBI, DHS, and NCTC remain dedicated to working with our partners on the effective implementation of the national strategy and continue to evolve our response to this threat.

As part of the national strategy, the FBI has increased intelligence production regarding the DT threat; continued to develop and implement TATM teams throughout the country; enhanced engagement with private sector partners; and developed and provided unclassified resources – such as the *U.S. Violent Extremist Mobilization Indicators* booklet, which was jointly developed with DHS and NCTC – to multiple audiences, including law enforcement partners, first responders, and the American public.

Importantly, DHS plays a key role in this whole-of-government effort, and I&A has undertaken a number of actions and initiatives to support the national strategy, in line with broader Departmental efforts. As noted above, in 2021, I&A established a Domestic Terrorism Branch solely focused on analyzing threats from domestic violent extremism. I&A has also delivered numerous briefings to a variety of partners regarding the DVE movements and various trends impacting homeland security, and I&A has contributed to the development of a number of National Terrorism Advisory System bulletins, which provide the public awareness of the current threat environment for the Homeland.

Further, DHS continues to enhance the role of its Counterterrorism Coordinator, who is responsible for coordinating the Department's counterterrorism-related activities – including intelligence, planning, operational, and policy matters – as well as the Counter Threats Advisory Board, which coordinates ongoing threat mitigation efforts across the Department.

DHS's Center for Prevention Programs and Partnerships (CP3) also continues to expand its efforts to prevent terrorism and targeted violence by providing partners at the state and local level with the tools to prevent violence. Through technical, financial, and educational assistance, CP3 is leveraging community-based partnerships to enhance local capabilities and ensure individuals receive help before they radicalize to violence. CP3 also partners with DHS's Federal Emergency Management Agency to administer the Targeted Violence and Terrorism Prevention (TVTP) Grants Program, which provides funding to enhance and expand prevention capabilities. The TVTP grant program complements existing programs that enhance the preparedness of our nation, including the Nonprofit Security Grant Program which provides support for target

hardening and other physical security enhancements at nonprofit organizations, as well as the State Homeland Security Program and Urban Area Security Initiative grant programs, which have prioritized combating domestic violent extremism as a "National Priority Area" in both FY 2021 and FY 2022.

### *Legislative Initiatives*

The DOJ continually assesses whether additional legislative authorities would improve our efforts to combat DT and other national security threats. The FBI is actively working with DOJ on some broader legislative initiatives that can benefit both federal investigations and prosecutions, including those relating to DT. For example, there are ongoing discussions about adjusting legislation in response to the challenges in disrupting juvenile threat actors via federal law enforcement actions. We will inform and work with the Congress in the event we identify any critical gaps in our authorities that may have negative effects on our ability to accomplish our mission.

### *Resource Enhancements*

To close the gaps in the FBI's ability to disrupt and deter DT threats, the DOJ and FBI have continuously engaged with Congress and the Office of Management and Budget to appropriately allocate resources towards combatting the DT threat.

Meanwhile, DHS is committed to expanding its ability to collect, analyze, and share domestic violent extremism information overtly or from publicly available sources, consistent with its authorities, while simultaneously safeguarding privacy, civil rights, and civil liberties of all persons, to enhance the Department's ability to rapidly analyze and communicate DT threats and inform policy makers' and its homeland security partners' decisions and actions, and to enhance and expand the ability of our partners across all levels of government and the private sector to prevent acts of terrorism and targeted violence.

**Appendix A**

**Significant Domestic Terrorism Incidents in the United States from 2020 and 2021[22]**

This appendix solely includes incidents the Federal Bureau of Investigation (FBI) has investigated as significant domestic terrorism (DT) incidents. Additional incidents that meet the Department of Homeland Security's (DHS's) statutory definition of terrorism and that DHS analysts assess to be incidents of DT may not be included. These incidents typically have been investigated by the FBI as hate crimes and/or by state and local law enforcement for criminal violations of laws in their respective jurisdictions.

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| January 2020: Georgia | Three racially or ethnically motivated violent extremists (RMVEs) who advocated for the superiority of the white race were arrested and charged with violations, including conspiracy to commit murder and participation in a criminal gang. The individuals, all members of "The Base," a self-identified RMVE organization, conspired in a plot to murder individuals they perceived to be "anti-fascists." In November 2021, all three subjects pleaded guilty. One subject was sentenced to 40 years, with 20 years to serve in prison; another subject was sentenced to 30 years, with 8-15 years to serve in prison; and the third subject was sentenced to 25 years, with 6 years to serve in prison. |
| January 2020: Delaware; Maryland | Three RMVEs who advocated for the superiority of the white race, one of whom is a Canadian national, were arrested in Delaware and Maryland and charged with violations related to harboring an illegal alien and firearms. In December 2020, one subject pleaded guilty and was sentenced to five years in prison. In June 2021, the other two subjects pleaded guilty, and in October 2021, they were each sentenced to nine years in prison. |
| January 2020: Wisconsin | A RMVE who advocated for the superiority of the white race was arrested and charged with violations for his alleged role in vandalizing a synagogue in Racine, Wisconsin. The individual's arrest was part of a broader law enforcement campaign to disrupt DT acts planned by subjects associated with the "The Base," a self-identified RMVE organization. In July 2020, the subject pleaded guilty. |

---

[22] Unless otherwise noted, some of these matters are active/pending.

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| February 2020: Arizona; Florida; Texas; Washington | Four RMVEs who advocated for the superiority of the white race, and who were associated with the "Atomwaffen Division," a self-identified RMVE organization, were arrested and charged with violations related to their roles in a coordinated operation to intimidate and threaten journalists and activists through the targeted distribution of threatening posters to their victims in-person or through the mail. In September 2020, one subject pleaded guilty, and in December 2020, the subject was sentenced to 16 months in prison. In September 2020, a second subject pleaded guilty, and in March 2021, the subject was sentenced to time served. In April 2021, a third subject pleaded guilty, and in August 2021, the subject was sentenced to three years in prison. In September 2021, the fourth subject was tried and convicted, and in January 2022, the subject was sentenced to seven years in prison. |
| February 2020: Texas | An RMVE who advocated for the superiority of the white race was arrested and charged for violations related to his participation in a conspiracy involving "swatting," a harassment tactic in which emergency services are dispatched to an unwitting person's location. The individual's targets included at least one news office and journalist. In July 2020, the subject pleaded guilty, and in May 2021, the subject was sentenced to 41 months in prison. |
| March 2020: Missouri | The FBI attempted to arrest an RMVE who advocated for the superiority of the white race on one charge related to providing material support to terrorists based on the subject's plot to carry out a mass-casualty attack targeting a Missouri hospital. The individual succumbed to injuries after a shooting incident during the attempted arrest. The subject's attack plot included using a vehicle-based improvised explosive device and came after approximately seven months of planning and preparation, which included the acquisition of bomb-making materials. |
| May 2020: New York | Following a local law enforcement vehicle pursuit, local deputies and a militia violent extremist (MVE) exchanged gun fire, and the MVE died as a result of the interaction. The investigation recovered pipe bombs, explosives manuals, a large amount of cash, and several firearms. |
| May 2020: Nevada | Three Las Vegas-based DVEs with personalized ideologies were arrested and charged for violations related to conspiring to cause destruction during protests and possession of an unregistered destructive device. The subjects plotted to damage and destroy buildings and property owned by the U.S. government, as well as a public utility installation. The subjects self-identified as part of the "Boogaloo" movement. |
| June 2020: Texas | An MVE was arrested and charged with violations related to conspiracy to distribute controlled substances. The court ordered the subject to be detained pending trial due to the threat the subject posed to the community. The subject used his social media accounts to advocate vigilante "guerrilla warfare" against National Guardsmen patrolling protests, to claim the subject was "hunting Antifa," and to threaten to kill looters. In April 2021, the subject pleaded guilty, and in November 2021, the subject was sentenced to 37 months in prison. |

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| June 2020: California | An MVE was arrested by local law enforcement and charged with violations related to the killing a Santa Cruz County, California, Sheriff's Office Sergeant and wounding a Deputy. The subject was later federally indicted and charged with violations related to the murder and attempted murder of a person assisting an officer or employee of the U.S. government. Investigation identified the MVE and an accomplice as the alleged perpetrators of the 29 May 2020 shootings of two Federal Protective Security Officers in Oakland, California, which resulted in the death of one of the officers. In June 2022, the subject pleaded guilty and was sentenced to 41 years in prison. |
| August 2020: California | An MVE was arrested by local law enforcement and charged with violations related to stalking and harassing a public official. The MVE allegedly sent 24 threatening letters to a county Public Health Officer after a shelter-in-place order in response to COVID-19. |
| August 2020: Oregon | A now-deceased anarchist violent extremist (AVE) who self-identified as "Antifa" shot and killed an individual in Portland, Oregon, during an event attended by individuals of opposing ideologies. The subject died during law enforcement's attempted arrest of the subject. |
| September 2020: Minnesota | Two Minnesota-based DVEs with personalized ideologies were arrested and charged with conspiring to provide material support and resources to Hamas, a designated foreign terrorist organization, for use against Israeli and U.S. military personnel overseas. The subjects proposed assisting the individuals they believed were members of Hamas, including discussing potentially destroying a courthouse in Minnesota and attacking a police station and other targets, as a means to advance the "Boogaloo" cause. In May 2022, one subject pleaded guilty and was sentenced to three years in prison. In June 2022, the second subject pleaded guilty and was sentenced to four years in prison. |
| September 2020: Ohio | An MVE was arrested and charged with violations related to the possession of a machine gun. Investigation revealed the subject expressed the desire to commit violence against perceived ideological opponents and sought to manufacture ricin from castor bean plants to place in the tips of hollow point rounds to do as much harm as possible to potential victims. In August 2021, the subject pleaded guilty, and in December 2021, the subject was sentenced to time served. |
| September 2020: California | An MVE was arrested and charged with firearms-related violations. Local police had also previously arrested the subject in May 2020 for allegedly driving his truck into a crowd of protesters. In May 2021, the subject pleaded guilty, and in October 2021, the subject was sentenced to one year and one day in prison. |
| October 2020: Michigan | During the attempted arrest of an MVE on firearms-related charges, the MVE fired upon law enforcement and died as a result of the interaction. The subject previously expressed his willingness to die for his cause and engage violently with law enforcement, such as during a traffic stop or a law enforcement visit to his property. |

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| October 2020: Delaware; Michigan; South Carolina | Thirteen MVEs, some of whom, self-identified as the "Wolverine Watchmen," were arrested and charged with violations related to an alleged conspiracy to kidnap the Governor of Michigan before the November 2020 general election because of perceived abuses of power pertaining to her response to the COVID-19 pandemic. Of the 13 subjects, six were arrested and charged federally, and the remaining seven were arrested and charged by state/local authorities. Of the six subjects charged federally:<br>• In January 2021, one subject pleaded guilty, and in August 2021, the subject was sentenced to 75 months in prison.<br>• In February 2022, a second subject pleaded guilty, and in October 2022, the subject was sentenced to 48 months in prison.<br>• In April 2022, a jury acquitted two of the individuals.<br>• In August 2022, a jury convicted the remaining two individuals. |
| November 2020: New York | An MVE was arrested and charged with violations related to threatening to kill politicians, members of law enforcement, and protesters in retaliation for the 2020 U.S. Presidential Election. In April 2021, the subject pleaded guilty. In May 2022, the MVE was sentenced to 36 months in prison for being a convicted felon in possession of a firearm. |
| November 2020: Ohio | The FBI attempted to arrest an RMVE motivated by racial injustice in American society, the desire for a separate Black homeland, and/or violent interpretations of religious teachings, on charges related to kidnapping a woman, murdering another, and transporting the woman across state lines. During the attempted arrest, the subject fired upon law enforcement and was fatally wounded during the interaction. Investigation identified the subject's social media postings, which revealed his violent interpretation of religious teachings, including content questioning the identity of the true followers of Judaism and claiming that white Christians had historically forced their religion upon enslaved Africans. |
| Summer and Early Fall 2020 Nationwide | Multiple threat actors – including DVEs adhering to various DT ideologies and criminal actors – primarily targeted businesses and law enforcement as part of violence and criminal activity surrounding lawful protests held nationwide during the summer and early fall of 2020. The FBI and its law enforcement partners arrested hundreds of individuals on a variety of charges, primarily related to property crimes against businesses, violence against law enforcement and law enforcement property, and criminal activity targeting government buildings and property. |
| January 2021: Washington, DC | On 5 January 2022, an unidentified subject(s) with an unidentified motivation placed two pipe bombs in Washington, DC. The subject(s) placed one device in an alley behind the Republican National Committee Headquarters and another device next to a park bench near the Democratic National Committee Headquarters. Law enforcement officers identified the devices and secured the area without any detonation. |

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| January 2021: Washington, DC | Multiple threat actors – including DVEs adhering to various DT ideologies and criminal actors – participated in the 6 January 2021 siege on the U.S. Capitol, disrupting a joint session of the U.S. Congress in the process of affirming the presidential election results. During the attack, approximately 140 police officers were assaulted; and according to a May 2021 estimate by the Architect of the Capitol, the attack caused approximately $1.5 million worth of damage to the U.S. Capitol building. During 2021, more than 725 individuals were arrested in nearly all 50 states and Washington, DC, for their criminal actions related to the siege on the U.S. Capitol.

As of the end of 2021, of the more than 725 subjects arrested:
- More than 225 subjects were charged with assaulting, resisting, or impeding officers or employees.
- Approximately 640 subjects were charged with entering or remaining in a restricted federal building or grounds.
- Dozens of subjects were charged with conspiracy, either to: obstruct a Congressional proceeding; obstruct law enforcement during a civil disorder; injure an officer; or some combination of the three.
- Approximately 165 subjects pleaded guilty to a variety of federal charges, from misdemeanors to felony obstruction.
- Approximately 70 subjects received a variety of sentences for their criminal activity, from probation to periods of incarceration in prison. |
| January 2021: Florida | An AVE was arrested and charged with violations related to interstate threats after the subject issued a "Call to Arms" for like-minded individuals to violently confront protestors who may gather at the Florida Capitol in the wake of the 6 January 2021 siege on the U.S. Capitol. In May 2021, a jury found the subject guilty, and in October 2021, the subject was sentence to 45 months in prison. |
| February 2021: Illinois | An MVE was arrested and charged with firearms-related violations. The subject sought to recruit like-minded individuals to execute militant and random attacks and expressed a desire to violently take over a television station to broadcast the subject's own message. |
| March 2021: Georgia | A DVE with a personalized ideology related to his claimed sex addiction was arrested and charged with violations relating to the subject's execution of fatal shootings at spas near Atlanta, Georgia, killing eight individuals and injuring others. He targeted the spas in an attempt to eliminate "temptation" and allegedly plotted a subsequent attack against a pornography-related target in Florida. In July 2021, the subject pleaded guilty to state/local charges of murder and was sentenced to life in prison. |
| April 2021: Texas | An MVE was arrested and charged with violations related to the subject's plot to blow up an Amazon data center, which the subject hoped would provoke a reaction that would convince the American people to take action against what he perceived to be a "dictatorship." In June 2021, the subject pleaded guilty, and in October 2021, the subject was sentenced to 10 years in prison. |

| DATE AND LOCATION | DESCRIPTION |
|---|---|
| May 2021: Georgia | Three MVEs were arrested and charged with violations related to their plot to target mobile COVID-19 vaccination sites. In January 2022, one subject pleaded guilty, and in June 2022, the subject was sentenced to 18 months in prison. In February 2022, a second subject pleaded guilty, and in May 2022, the subject was sentenced to 21 months in prison. In February 2022, the third subject pleaded guilty, and in May 2022, the subject was sentenced to three years in prison. |
| June 2021: Colorado | A now-deceased DVE with a personalized ideology shot and killed an Arvada Police Department officer who was responding to a suspicious activity call. A nearby civilian responded to the area of the shooting and engaged the subject; both the civilian and the subject were killed during the interaction. During the shootings, two police vehicles were also struck by gunfire. Investigation indicates the subject had a personalized ideology and was targeting law enforcement. |
| June 2021: Florida | An RMVE motivated by racial injustice in American society, the desire for a separate Black homeland, and/or violent interpretations of religious teachings, allegedly shot and killed a Daytona Beach Police Department officer after the officer approached the subject's vehicle with the subject inside. The subject fled the scene and was later arrested in Georgia on 26 June 2021 and charged by state/local authorities with first degree murder of a law enforcement officer with a firearm. |
| June 2021: Massachusetts | A now-deceased RMVE who advocated for the superiority of the white race stole a box truck and drove it into a vehicle with two occupants and then crashed the truck into a residence. The subject exited the truck and shot and killed two African American individuals. The subject fired at responding law enforcement, who returned fire, and the subject died as a result of the interaction. Investigation revealed the subject left behind writings indicating he conducted the attack based on RMVE ideologies. |
| July 2021: Ohio | An involuntary celibate violent extremist was arrested and charged with hate crime and firearms-related violations related to the subject's alleged plot to attack a sorority. |
| July 2021: California | Two MVEs were arrested and charged with violations related to their alleged plot to bomb the Democratic Party headquarters in Sacramento, California. Investigation revealed evidence that the subjects had multiple pipe bombs and dozens of firearms. In November 2021, one of the two subjects pleaded guilty. |
| September 2021: Alaska | A DVE with a personalized ideology was arrested and charged with violations related to threatening interstate communications, cyberstalking, and making a bomb threat. The arrest and charges were based on the subject allegedly making threats of violence against multiple law enforcement departments. |
| September 2021: Texas | A DVE with a personalized ideology was arrested and charged with arson-related violations for throwing a Molotov cocktail through the window of a political party office in Austin, Texas, causing a fire. In January 2022, the subject pleaded guilty, and in May 2022, the subject was sentenced to six years in prison. |

**Appendix B**



## OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

# (U) Domestic Violent Extremism Poses Heightened Threat in 2021

## 01 March 2021

## (U) Executive Summary

(U) **The IC assesses that domestic violent extremists (DVEs) who are motivated by a range of ideologies and galvanized by recent political and societal events in the United States pose an elevated threat to the Homeland in 2021.** Enduring DVE motivations pertaining to biases against minority populations and perceived government overreach will almost certainly continue to drive DVE radicalization and mobilization to violence. Newer sociopolitical developments—such as narratives of fraud in the recent general election, the emboldening impact of the violent breach of the US Capitol, conditions related to the COVID-19 pandemic, and conspiracy theories promoting violence—will almost certainly spur some DVEs to try to engage in violence this year.

(U) **The IC assesses that lone offenders or small cells of DVEs adhering to a diverse set of violent extremist ideologies are more likely to carry out violent attacks in the Homeland than organizations that allegedly advocate a DVE ideology.** DVE attackers often radicalize independently by consuming violent extremist material online and mobilize without direction from a violent extremist organization, making detection and disruption difficult.

(U) **The IC assesses that racially or ethnically motivated violent extremists (RMVEs) and militia violent extremists (MVEs) present the most lethal DVE threats, with RMVEs most likely to conduct mass-casualty attacks against civilians and MVEs typically targeting law enforcement and government personnel and facilities.** The IC assesses that the MVE threat increased last year and that it will almost certainly continue to be elevated throughout 2021 because of contentious sociopolitical factors that motivate MVEs to commit violence.

(U) **The IC assesses that US RMVEs who promote the superiority of the white race are the DVE actors with the most persistent and concerning transnational connections because individuals with similar ideological beliefs exist outside of the United States and these RMVEs frequently communicate with and seek to influence each other.** We assess that a small number of US RMVEs have traveled abroad to network with like-minded individuals.

(U) **The IC assesses that DVEs exploit a variety of popular social media platforms, smaller websites with targeted audiences, and encrypted chat applications to recruit new adherents, plan and rally support for in-person actions, and disseminate materials that contribute to radicalization and mobilization to violence**.

(U) **The IC assesses that several factors could increase the likelihood or lethality of DVE attacks in 2021 and beyond, including escalating support from persons in the United States or abroad, growing perceptions of government overreach related to legal or policy changes and disruptions, and high-profile attacks spurring follow-on attacks and innovations in targeting and attack tactics.**

(U) **DVE lone offenders will continue to pose significant detection and disruption challenges because of their capacity for independent radicalization to violence, ability to mobilize discretely, and access to firearms.**

## (U) Scope Note

(U) As part of the Office of the Director of National Intelligence (ODNI) mission to lead and support Intelligence Community (IC) integration and deliver insights, the ODNI has leveraged IC components to provide a comprehensive intelligence assessment on domestic violent extremists (DVEs). This assessment was prepared under the auspices of the DNI—in consultation with the Attorney General and Secretary of Homeland Security—and was drafted by the National Counterterrorism Center (NCTC), Federal Bureau of Investigation (FBI), and Department of Homeland Security (DHS), with contributions from the Central Intelligence Agency (CIA) and the Defense Intelligence Agency (DIA). The FBI and DHS lead the IC's counter DVE missions —and are thus positioned to bring domestic collection to bear in understanding and addressing this issue—while the NCTC supports them. Other IC elements, such as CIA and DIA, contribute their unique accesses or expertise, including on ties that foreign elements have to DVEs. All agencies are mindful of the duty to respect privacy, civil rights, and civil liberties and to act within the authorities granted to them as they seek to put together as complete an intelligence and analytic picture as is possible.

(U) For the purposes of this assessment, the IC defines a DVE as an individual based and operating primarily in the United States without direction or inspiration from a foreign terrorist group or other foreign power and who seeks to further political or social goals wholly or in part through unlawful acts of force or violence. This assessment does not evaluate the actions of individuals engaged solely in activities protected by the First Amendment or other rights secured by the Constitution of the United States.

# (U) IC Categories of Domestic Violent Extremists

UNCLASSIFIED

(U) Domestic violent extremists are US-based actors who conduct or threaten activities that are dangerous to human life in violation of the criminal laws of the United States or any state; appearing to be intended to intimidate or coerce a civilian population; and influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping, as per the definition of domestic terrorism in 18 U.S. Code 2331 (5). Mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics may not constitute violent extremism, and may be constitutionally protected. While the majority of DVEs fall into one threat category, some draw upon or are inspired by ideological themes found in other threat categories.



## RACIALLY OR ETHNICALLY MOTIVATED VIOLENT EXTREMISTS

DVEs with ideological agendas derived from bias, often related to race or ethnicity, held by the actor against others, including a given population group.



## ANIMAL RIGHTS/ ENVIRONMENTAL VIOLENT EXTREMISTS

DVEs seeking to end or mitigate perceived cruelty, harm, or exploitation of animals or perceived exploitation or destruction of natural resources and the environment.



## ABORTION-RELATED VIOLENT EXTREMISTS

DVEs with ideological agendas in support of pro-life or pro-choice beliefs.



## ANTI-GOVERNMENT/ANTI-AUTHORITY VIOLENT EXTREMISTS

DVEs with ideological agendas derived from anti-government or anti-authority sentiment, including opposition to perceived economic, social, or racial hierarchies; or perceived government overreach, negligence, or illegitimacy.

**MILITIA VIOLENT EXTREMISTS:**
DVEs who take overt steps to violently resist or facilitate the overthrow of the US Government in support of their belief that the US Government is purposely exceeding its Constitutional authority and is trying to establish a totalitarian regime; oppose many federal and state laws and regulations, particularly those related to firearms ownership.

**ANARCHIST VIOLENT EXTREMISTS:**
DVEs who oppose all forms of capitalism, corporate globalization, and governing institutions, which are perceived as harmful to society.

**SOVEREIGN CITIZEN VIOLENT EXTREMISTS:**
DVEs who believe they are immune from government authority and laws.



## ALL OTHER DOMESTIC TERRORISM THREATS

DVEs with ideological agendas that are not otherwise defined under one of the other domestic terrorism threat categories, including a combination of personal grievances and beliefs with potential bias related to religion, gender, or sexual orientation.

2021-01619-NCTC-ID

Appendix C

SPECIAL ANALYSIS

  

17 JUNE 2022

## Wide-Ranging Domestic Violent Extremist Threat to Persist

(U) The Department of Homeland Security (DHS), Federal Bureau of Investigation (FBI), and National Counterterrorism Center (NCTC) assess that domestic violent extremists (DVEs)[a] fueled by various evolving ideological and sociopolitical grievances pose a sustained threat of violence to the American public, democratic institutions, and government and law enforcement officials. Flashpoint events in the coming months may exacerbate these perceived grievances, further increasing the potential for DVE violence. DVEs adhering to different violent extremist ideologies have coalesced around anger at issues including perceived election fraud, as well as immigration and government responses to the COVID-19 pandemic, drawing on their varied perceptions of those issues. These factors, along with fluid conspiracy theories, have amplified longstanding DVE grievances, including perceptions of government and law enforcement overreach or oppression and shifts in US demographics and cultural values.

- The mass shooting last month targeting Black people in Buffalo, New York, was allegedly perpetrated by a racially or ethnically motivated violent extremist (RMVE) driven by a belief in the superiority of the white race. The RMVE was charged with federal hate crimes and using a firearm to commit murder in June 2022. This attack underscores how RMVEs—who have been responsible for a majority of DVE-related deaths since 2010—pose a significant threat of lethal violence against civilians, particularly of racial, ethnic, and religious minorities.

- The lethal threat from militia violent extremists (MVEs) remains elevated, primarily toward government and law enforcement personnel, as MVEs remain willing to use violence to redress perceived government overreach and other sociopolitical grievances, judging from an increase in MVE plotting, disruptions, and FBI investigations since 2020. Anarchist violent extremists (AVEs) present a threat of sporadic violent physical assaults and property crimes impacting the efficient operation of critical infrastructure; developments that heighten perceptions of inequality or social injustice might further embolden AVEs to commit acts of violence.

- Several DVEs motivated by perceptions of fraud in the 2020 general election were arrested in 2021 and 2022 for plotting or threatening violence against federal, state, and local officials and political party representatives, highlighting the elevated threat posed to elected officials countrywide. In November 2021, a New York–based MVE was sentenced to 19 months in prison for threatening to assault and murder members of the US Congress.

- A wide-ranging set of DVEs have shared their perceptions of government overreach on COVID-19 pandemic mitigation efforts and anger at government responses to immigration issues in person and online and have encouraged one another to act violently. Anger at the mitigation efforts of businesses and federal, state, and local governments motivated several DVE attacks, plots, and calls for violence against health care workers and mobile vaccine clinics in 2020 and 2021. In 2021, some DVEs visited the US-Mexico border with the intention of detaining those crossing into the United States.

---

[a] For the purpose of this assessment, DHS, FBI, and NCTC use the term DVE to refer to an individual based and operating primarily within the United States or its territories without direction or inspiration from a foreign terrorist group or other foreign power who seeks to further political or social goals, wholly or in part, through unlawful acts of force or violence. The mere advocacy of political or social positions, political activism, use of strong rhetoric, or generalized philosophic embrace of violent tactics do not constitute domestic violent extremism and is constitutionally protected. DHS, FBI, and NCTC apply this term as appropriate within the scope of their respective authorities.

2022-10514

AUTHORED BY FBI, DHS, NCTC

SPECIAL ANALYSIS

  

17 JUNE 2022

DVEs carried out at least four lethal attacks in 2021—the same number as in 2020—killing 13 people. Additional potential DVE incidents that have occurred in 2022 remain under FBI investigation. The number of pending FBI domestic terrorism investigations grew from approximately 1,000 in the spring of 2020 to approximately 2,700 in late 2021, in part because of investigations related to the siege of the US Capitol on 6 January 2021. Since the beginning of 2010, DVEs adhering to various violent extremist ideologies have conducted at least 47 lethal attacks that have killed 152 people in the United States. These figures do not include lethal attacks classified as violent hate crimes rather than DVE attacks.

(U) Developments related to midterm elections, immigration, perceptions of government overreach or social injustice, and other flashpoint events will probably motivate some DVEs across ideologies to plot or attempt violence in the coming months. In the context of these events, some DVEs might promote or exploit the public prevalence of violent extremist narratives to encourage violence. DVE attackers and plotters are typically lone actors—individuals acting without the direct support of others—who plot or conduct attacks on soft targets using easily accessible weapons. The persistent difficulty of detecting threats from such actors underscores the value of the public's assistance in identifying people who might be mobilizing to violence and in reporting concerning behavior to authorities before violence occurs.

- Heightened tensions surrounding the 2022 midterm election cycle will probably cause some DVEs to target political candidates, party offices, judges, election events, or poll workers because of their actual or perceived political affiliations, as several did in 2021. On 26 January 2021, FBI arrested a California-based MVE for allegedly threatening family members of a member of the US Congress and a journalist. The MVE was sentenced to three years in prison in December 2021.

- Immigration-related developments, amplified by DVEs in violent extremist messaging, might spur DVEs to conduct planned or opportunistic violence. Historically, RMVEs—such as the Pittsburgh synagogue attacker in 2018 and the El Paso Walmart attacker in 2019—have conducted attacks motivated in part by immigration-related grievances, and MVEs have targeted perceived immigration-related threats to national security, including initiating armed border patrols with the intent of curbing illegal immigration, posing a potential risk to law enforcement and immigrants. AVEs have targeted US Immigration and Customs Enforcement (ICE) facilities in opposition to US Government immigration policies.

- Even if perceptions of government overreach related to COVID-19 mitigation measures subside, some DVEs will probably continue adhering to evolving anti-government and conspiracy narratives that they adopted during the pandemic and might use to justify violence. Some DVE adherents to QAnon conspiracy theories continue to violently target a shifting array of individuals and entities that they accuse of perpetrating or enabling child abuse. Such conspiracy theories have led to threats or acts of violence, including against businesses, US Government buildings, public officials, and the transportation sector that significantly impacted their operations.

- New legislation or US Supreme Court rulings that exacerbate DVEs' grievances or deepen their animosity toward perceived ideological opponents, including on high-salience issues such as abortion and gun rights, might result in increased threats of violence from a range of DVEs. Law enforcement involvement in the deaths of DVEs or like-minded people might also lead to calls for violence. Additionally, in 2020, some DVEs exploited lawful gatherings after law enforcement–involved deaths of unarmed African-Americans to engage in violence against ideological opponents and other targets.

SPECIAL ANALYSIS



17 JUNE 2022

We assess that of all the DVE movements, RMVEs driven by a belief in the superiority of the white race continue to possess the most persistent and concerning transnational connections because adherents to this ideology are present throughout the West, frequently communicate with each other, and, at times, have inspired attacks. US-based RMVEs primarily forge connections with foreign counterparts online to network with like-minded individuals and deepen their commitment to RMVE causes. Many transnational, online RMVE networks have emerged since the mid-2010s, fostering a decentralized movement that often promotes violent extremism and encourages supporters to undertake violent action that is framed around the concept of leaderless resistance.

## APPENDIX

### WIDE VARIETY OF DVE ACTORS THREATEN THE UNITED STATES

We assess that the United States faces threats from a wide range of DVEs who seek to engage in ideologically motivated violence. This appendix gives an overview of the five DVE threat categories that the US Government uses: RMVE; anti-government or anti-authority violent extremism, which includes MVE, AVE, and sovereign citizen violent extremism (SCVE); "all other domestic terrorism threats" that do not fit into the other DVE threat categories, including violent extremists driven by political, personal, or conspiracy theory–related grievances, as well as involuntary celibate violent extremists (IVEs); abortion-related violent extremism; and animal rights or environmental violent extremism.

**Racially or Ethnically Motivated Violent Extremism**

**RMVEs Driven by Belief in the Superiority of the White Race Present Enduring Lethal Threat**

(U) We assess that RMVEs who are driven by a belief in the superiority of the white race continue to pose the primary threat among DVEs of committing lethal violence against civilians, based on their ideology and attack history. These RMVEs advocate and commit violence in support of a transnational movement whose adherents believe that white people of European descent are superior to and threatened by minority populations, as well as by other whites whom they perceive as supporting these populations. Some of these RMVEs promote accelerationist thinking, which advocates committing violence to precipitate a large-scale conflict, often framed as a "race war," in the United States and other Western democracies that these RMVEs believe will result in a white ethnostate.

- The most recent such RMVE attack before the Buffalo shooting took place on 26 June 2021, when a now-deceased RMVE who allegedly used his belief in the superiority of the white race to justify violence conducted a shooting in Winthrop, Massachusetts, resulting in two deaths.

- Since 2010, US-based RMVEs driven by a belief in the superiority of the white race have committed 17 lethal attacks that have killed a total of 77 people—slightly more than half of all fatalities from DVE attacks during that period. These RMVE attacks include the mass shootings in Buffalo, New York, in 2022; El Paso, Texas, in 2019; Pittsburgh, Pennsylvania, in 2018; and Charleston, South Carolina, in 2015. Typical targets of these RMVEs include houses of worship, areas conducive to large gatherings, and people whom the attackers see as representative of those against whom they hold grievances.

SPECIAL ANALYSIS



17 JUNE 2022

**RMVEs Motivated by Real or Perceived Racism and Injustice in American Society, the Desire for a Separate Black Homeland, and/or Violent Interpretations of Religious Teachings Will Probably Engage in Sporadic Violence**

(U) RMVEs who are motivated by perceptions of racial injustice in American society, the desire for a separate Black homeland, and/or violent interpretations of religious teachings will probably continue to commit intermittent acts of violence. This subset of RMVEs has historically targeted those they perceive as representing oppression, including government officials, law enforcement, and white people, as well as individuals and locations associated with Judaism. These RMVEs conducted 11 lethal attacks from 2010 to 2021, resulting in 25 fatalities.

- On 23 June 2021, an RMVE allegedly used his interpretations of Black Hebrew Israelite religious teachings to justify violence and shot to death a law enforcement officer in Daytona Beach, Florida. The suspect has been charged with capital murder and is awaiting trial.

- In December 2019, an RMVE allegedly motivated by antisemitism and his interpretations of Black Hebrew Israelite religious teachings attacked the home of a Hasidic rabbi in New York during a Hanukkah celebration, wounding five people, one of whom later died. In the same month, two RMVEs with similar motivations fatally shot a local law enforcement officer at a cemetery in New Jersey and attacked a nearby kosher supermarket, killing three people and injuring several others. Both RMVEs were fatally wounded during an encounter with responding law enforcement officers.

- RMVEs conducted attacks on law enforcement during the weeks after the officer-involved shooting deaths of two African Americans in Louisiana and Minnesota in July 2016. On 7 July 2016, a now-deceased RMVE motivated by incidents of actual or perceived police brutality ambushed and shot 11 law enforcement officers, killing five, in Dallas, Texas. On 17 July 2016, a now-deceased RMVE with similar motivations ambushed and shot six law enforcement officers, killing three, in Baton Rouge, Louisiana.

### Anti-Government or Anti-Authority Violent Extremism

**MVEs Pose Heightened Lethal Threat to Law Enforcement and Symbols of Government**

(U) The lethal threat level from MVEs to law enforcement and government personnel will almost certainly remain elevated in the coming months because some of these actors are willing to use violence to redress perceived government overreach and other sociopolitical issues. Some MVEs will almost certainly continue to harbor grievances over their perceptions of fraud during the 2020 election and government measures related to the COVID-19 pandemic. Some MVEs might also mobilize to violence in response to the enactment of any legislation that they perceive as restricting access to firearms, expanding immigration, or managing public land that MVEs might view as unacceptable infringements on civil liberties or harmful to the security of the United States.

- In April 2021, FBI arrested an MVE in Texas who intended to bomb a commercial cloud service provider's servers under the belief that the data center provided services to federal agencies, including CIA and FBI. The MVE pleaded guilty to a malicious attempt to destroy a building with an explosive and was sentenced to 10 years in federal prison in October 2021.

- In January 2021, FBI disrupted a plot by two suspected MVEs who were allegedly planning to bomb the state headquarters of a political party in Sacramento, California. Federal investigators discovered multiple pipe bombs and dozens of firearms at the home of one of the MVEs. The subjects pleaded guilty to multiple offenses and are awaiting sentencing.



- Dozens of probable MVEs were arrested for their involvement in the violent, unlawful entry of the US Capitol building on 6 January 2021.

**Most AVEs Will Probably Engage in Nonlethal Criminal Activity, Impact Law Enforcement Operations**

(U) We assess that AVEs will continue to plot and potentially conduct sporadic attacks on critical infrastructure and federal, state, and local facilities, as well as violent physical assaults against their perceived ideological opponents. Perceptions of inequality or social injustices related to flashpoint events might further embolden AVEs to commit acts of violence. Target selection by AVEs—whether premeditated or opportunistic—will probably remain focused on people or institutions seen as representing authority, capitalism, and oppression, including perceived racism or fascism. Although AVEs have sometimes acted collectively, we assess AVEs are not organized at the countrywide level.

- In January 2021, FBI arrested a Florida-based AVE after he issued a "call to arms" for like-minded individuals to join him with firearms to violently confront others who might gather at a lawful protest at the Florida Capitol earlier that month. In October 2021, the AVE was sentenced to 44 months in federal prison for communicating a threat to kidnap or injure others.
- In August 2020, an individual who expressed views on social media consistent with AVE ideology fatally shot a man during an event with individuals of opposing ideologies in Portland, Oregon. This incident was the first known lethal attack in the United States by an AVE in more than 20 years. The AVE was subsequently killed after drawing a firearm when law enforcement attempted to arrest him.
- In July 2019, a probable AVE set fire to a vehicle and threw incendiary devices at a building near a detention facility linked to ICE operations in Tacoma, Washington. He then engaged responding law enforcement officers with an AR-style rifle and was killed during the encounter.

**(U) SCVEs Pose Sporadic Threat of Violence Against Law Enforcement and Government Personnel**

(U) We assess that sovereign citizen violent extremists (SCVEs) will continue to pose a sporadic threat of violence against law enforcement and government personnel on the basis of SCVEs' perceived rights and belief in their immunity from government authority and laws. In furtherance of these beliefs, SCVEs have committed a wide variety of property and financial crimes that have often brought them into conflict with law enforcement, sometimes resulting in violence. Law enforcement officers will probably remain SCVEs' most frequent targets, with violence most likely to occur during law enforcement encounters, including traffic stops.

- On 3 July 2021, 11 individuals, believed to be members of an armed organization that espouses sovereign citizen ideology, engaged in an hours-long armed standoff with Massachusetts State Police near Wakefield that was streamed live by the group's spokesperson on a social media platform. The incident occurred after an attempted traffic stop on a vehicle driven by group members and had the potential to escalate to violence. After the standoff, the individuals were charged with multiple firearms-related violations. Group members' statements before, during, and after the standoff have been consistent with sovereign citizen extremist ideology.
- In February 2018, a probable SCVE opened fire on local law enforcement officers who were trying to serve a warrant at the violent extremist's residence in Locust Grove, Georgia, for failure to appear in court. After the SCVE killed one police officer and wounded two sheriff's deputies, law enforcement officers shot and killed him.

AUTHORED BY FBI, DHS, NCTC

  

**All Other Domestic Terrorism Threats**

**Other DVEs Pose Threat of Violence Because of Political Grievances, Conspiracy Theories**

(U) We assess that DVEs who mobilize to commit violence in response to partisan grievances and who do not fall under other DVE threat categories will pose a heightened threat to individuals in the 2022 midterm election cycle because of their actual or perceived political affiliation. These DVEs might target candidates, government officials, other civilians, and institutions with violence to try to redress their perceived grievances or advance their agendas. Conspiracy theories related to the 2020 general election will probably continue to contribute to the radicalization of some DVEs with partisan grievances and potentially be reinforced by their view that the Capitol breach on 6 January 2021 was a success.

- In December 2021, a DVE motivated by partisan grievances who is awaiting trial was arrested en route to Washington, DC, after telling law enforcement officers that he would "do whatever it takes" to kill government leaders on his "hit list." The DVE was found to have a rifle, ammunition, loaded magazines, body armor, and medical kits.

- In September 2021, authorities arrested a DVE motivated by partisan grievances for throwing a Molotov cocktail at the offices of a political party in Austin, Texas. The subject pleaded guilty to one count of arson and was sentenced to six years in prison.

- In June 2017, a now-deceased DVE injured several members of Congress, staffers, and responding officers after opening fire at a charity baseball event in Alexandria, Virginia.

(V) Conspiracy theories related to the COVID-19 pandemic almost certainly contribute to the mobilization to violence of some DVEs who do not fall into the other threat categories. We assess that these DVEs pose an ongoing threat to government officials and critical infrastructure.

- In March 2020, a DVE deliberately derailed a train that he was operating near the USNS Mercy hospital ship at the Port of Los Angeles to draw media attention to the ship's presence. The DVE told law enforcement that he believed that the ship had an "alternate purpose" related to COVID-19 or an unspecified US Government takeover and that he wanted to "wake people up." In April 2022, he was sentenced to three years in prison after pleading guilty to committing a terrorist attack and other violence against railroad carriers and mass transportation systems.

(W) We assess that adherence to elements of the continuously evolving QAnon conspiracy theory—some of which are bolstered by the resonance of election fraud narratives—will contribute to the radicalization and mobilization to violence of a small number of DVEs, posing a threat to individuals and institutions that supporters of the conspiracy theory have prominently denounced. The participation of some self-identifying QAnon adherents in the breach of the US Capitol on 6 January 2021—who were arrested and charged with violent entry and disorderly conduct in a restricted building and obstruction of an official proceeding — underscores how some QAnon adherents can accept the legitimacy of violent action.

- On 7 January 2021, a North Carolina–based, self-identified QAnon adherent was arrested by FBI in Washington, DC, and charged with interstate communication of threats after he brought firearms and ammunition into the city and threatened the Speaker of the House and DC Mayor. The DVE pleaded guilty and was sentenced to two years in federal prison.

- On 8 January 2021, a probable DVE and self-identified QAnon adherent was arrested on charges of destroying government property after allegedly firing several rounds at a federal courthouse in Oregon. In November 2021, the DVE was sentenced to probation.

2022-10514

AUTHORED BY FBI, DHS, NCTC

SPECIAL ANALYSIS



17 JUNE 2022

(U) Some DVEs form uniquely personalized grievances that might also draw from established DVE movements and, on a limited basis, from other violent extremist ideologies, probably aided by the proliferation and accessibility of a wide range of DVE and other extremist content online, a trend we expect to continue in coming years.

- On 21 June 2021, a now-deceased DVE conducted a shooting attack in Arvada, Colorado, killing two people. The preliminary investigation revealed that the alleged attacker's personalized ideology included a hatred of police stemming from perceptions of corruption among law enforcement agencies.

- On 16 March 2021, a DVE with a personalized ideology related to his claimed sex and pornography addictions allegedly conducted shootings at spas near Atlanta, Georgia, killing eight people. The attacker was sentenced to life in prison for four murders to which he pleaded guilty and is awaiting trial on four counts of murder to which he pleaded not guilty.

(V) We assess that involuntary celibate violent extremists (IVEs) pose a persistent threat of violence against women, heterosexual couples, and others perceived as successful in sexual or romantic pursuits. IVEs motivated by grievances related to their belief that society unjustly denies them sexual or romantic attention have conducted three lethal attacks in the United States since 2014, mostly using firearms, that have resulted in 17 fatalities. The incel movement, which includes IVEs, has online participants in many Western countries, and at least four Canadian IVEs have conducted lone-actor attacks since 2016.

- In July 2021, FBI arrested an IVE based on his alleged actions in planning an attack on women at a university in Ohio. The IVE allegedly wrote a manifesto describing his hatred of women and his desire to "slaughter" them. He was charged with illegal firearms possession and attempting to commit a hate crime and is awaiting trial.

- In May 2020, a self-identified involuntary celibate shot and injured three people at an outdoor mall in Glendale, Arizona, before authorities arrested him. In March 2022, the IVE pleaded guilty to two counts of attempted first degree murder and two counts of assault with a deadly weapon.

(W) **Abortion-Related Violent Extremism**

**Abortion-Related Violent Extremists Might React to Ongoing Events**

(U) We assess that abortion-related violent extremist activity will probably increase in line with abortion-related legislative and legal debates, such as those surrounding the recent unauthorized disclosure of a draft opinion in the anticipated US Supreme Court ruling in the case of Dobbs v. Jackson Women's Health Organization. Historically, abortion-related violent extremists motivated by pro-life beliefs have committed acts of violence, including at least 10 murders and dozens of bombings and arsons, all targeting abortion providers and facilities. Abortion-related violent extremists motivated by pro-choice beliefs— although historically less violent than pro-life abortion-related violent extremists—will probably pose a threat to individuals or critical infrastructure and will most often likely target organizations or people expressing pro-life views.

- On 31 December 2021, a fire destroyed an unoccupied reproductive health clinic in Knoxville, Tennessee. Local investigators determined that the event was an arson attack by unknown perpetrators.

- In September 2021, an individual from Oklahoma was arrested for making online threats targeting Texas lawmakers associated with state-level abortion restrictions. The individual pleaded guilty and is awaiting sentencing.

SPECIAL ANALYSIS



17 JUNE 2022

- On 3 January 2020, a DVE with a history of expressing pro-life beliefs online threw an incendiary device at the front window of a reproductive healthcare facility in Newark, Delaware, starting a fire that damaged the front porch and window. The subject pleaded guilty in February 2021 and was sentenced to 26 months in federal prison in March 2022.

### Animal Rights and Environmental Violent Extremism

**Animal Rights and Environmental Violent Extremists Primarily Target Critical Infrastructure**

(U) We assess that violent extremists supporting animal rights and environmental causes will continue to disrupt the operation of critical infrastructure to try to exact an economic toll on the industries they target. Most environmental violent extremist activity in recent years has opposed oil and natural gas infrastructure projects, particularly those near perceived ecologically sensitive habitats or waterways, while animal rights violent extremists primarily oppose large-scale farming or animal agriculture.

- In November 2020, two environmental violent extremists in Whatcom County, Washington, were arrested and charged with impeding the operation of a railroad signal system by using a "shunt" across the railroad tracks, which disrupts the electrical current on the tracks and can disable safety features, potentially causing derailments or other accidents. A claim of responsibility followed a similar incident in early 2020, stating that extremists had carried out the shunting with the goal of preventing the construction of an oil pipeline across British Columbia. Both defendants were found guilty and sentenced to one year and to six months in prison, respectively.

UNCLASSIFIED//FOR OFFICIAL USE ONLY



**FEDERAL BUREAU OF INVESTIGATION**
Domestic Terrorism Reference Guide

# Involuntary Celibate Violent Extremism

## (U) THREAT OVERVIEW

(U//FOUO) Involuntary celibate violent extremists (IVEs) are involuntary celibates (Incels) who seek to commit violence in support of their belief that society unjustly denies them sexual or romantic attention, to which they believe they are entitled. The Incel community is primarily an online community composed of individuals—most of whom are men—who blame political or social movements, such as feminism, for empowering others to deny them romantic or sexual attention. While most Incels do not engage in violence, IVEs have conducted at least five lethal attacks in the United States and Canada since 2014, resulting in 28 deaths. In online posts advocating for violence, IVEs often glorify previous IVE attackers, including "founding forefather" Elliot Rodger, who killed six individuals in California in 2014, as well as school shooters, including those who have no connection to Incel forums or IVE ideology.

## (U) TARGETS and TACTICS

(U//FOUO) **Targets:** IVEs primarily target those who they believe are unjustly denying them sexual or romantic attention, which, in most cases, are women. IVEs also blame attractive men for competing against them for female attention and, more broadly, justify the targeting of "normies," a term used to describe "normal people," who they believe perpetuate their Incel status. While IVEs often call for physical or sexual violence against specific, identified individuals, IVEs also post threats against groups they believe contribute to their Incel status. Past attacks have included federal buildings, colleges, sorority houses, public walkways, store fronts, and yoga studios. In three of the five IVE attacks since 2014, women were the primary targets or victims.

(U//FOUO) **Tactics:** All three IVE attackers in the United States utilized firearms in the commission of their attacks, with one attacker also using an edged weapon and vehicle, while the two IVE attackers in Canada used a rented vehicle and edged weapon, respectively. Of these five attackers, three posted pre-attack messages outlining their ideology or attack plans, and one shared a manifesto at the time of the attack.

## (U) INDICATORS

(U//FOUO) Indicators of IVE ideology may comprise constitutionally protected conduct, and no single indicator should be the sole basis for a determination of IVE or criminal activity. The following indicators of IVE ideology may constitute a basis for reporting or law enforcement action when observed in combination with suspicious criminal or potentially violent activity:

♦ (U//FOUO) Glorifying previous IVEs in online posts—to include the use of shorthand, such as using "ER" to refer to Elliot Rodger—when calling for violence (example: "Going to be a hERo at my school tomorrow")
♦ (U//FOUO) In text, video, or audio social media postings, describing a rationale for committing violence, targets of violence, desired societal outcomes of violence, and societal factors perceived to be exacerbating one's Incel status

## (U) NOTABLE ATTACKS or CRIMINAL ACTS

(U) In November 2018, Scott Beierle committed an attack at a yoga studio in Tallahassee, Florida, with a firearm, killing two and injuring four. Prior to the attack, Beierle posted misogynistic messages online and uploaded self-produced music containing violent language towards women. In a video shared online, Beierle stated he shared a similar outlook to Elliot Rodger and discussed the "virginity burden" placed on young men by society.

(U) In April 2018, Alek Minassian drove a rented van into a crowd in Toronto, Canada, killing ten and injuring 15. Prior to the attack, Minassian posted a social media message praising Elliot Rodger and promoting Incel ideology. Additionally, in an interview following the attack, Minassian stated his intention to commit "strikes on society in order to confuse and shake the foundations just to put all the normies in a state of panic."

(U) In May 2014, Elliot Rodger attacked a sorority house and pedestrians in Santa Barbara, California, with a knife, firearms, and a vehicle, killing six and injuring 14. Prior to the attack, Rodger posted an online video titled "Elliot Rodger's Retribution," and shared a written manifesto describing his grievance towards women and detailing a plan for their mass imprisonment and murder.

**(U) For additional information, please contact the Counterterrorism Analysis Section of the FBI Counterterrorism Division via email at FBI_CTAS@fbi.gov.**

(U) Disclaimer: Domestic Violent Extremists (DVEs) employ several indicators, some of which may be criminal and others which may constitute the exercise of rights guaranteed by the US Constitution. Under FBI policy and federal law, no investigative activity may be based solely on First Amendment activity. The FBI does not investigate, collect, or maintain information on US persons solely for the purpose of monitoring activities protected by the First Amendment. All personnel should exercise sound judgment and discretion in evaluating the totality of circumstances surrounding any of these indicators in order to determine whether a law enforcement or intelligence response or activity is warranted.

**(U) KEY TERMS**

| Term | Description |
|---|---|
| **AMazing hERo; going ER; Supreme Gentleman** | A reference to IVE attackers Elliot Rodger and Alex Minassian. "Going ER" often is used to state an intent to emulate Rodger by committing a mass attack. Rodger described himself as a "Supreme Gentleman." |
| **Ascension** | A term used to describe an Incel leaving Incel status by gaining sexual or romantic attention. |
| **-cel** | A suffix which is added to words to describe specific types of Incels. Examples include: baldcel (Incel who is bald); heightcel (Incel who is short); rapecel (Incel who condones rape); escortcel (Incel who supports use of prostitution to gain sexual attention). |
| **Chad (Chadpreet; Chang; Tyrone)** | Race-specific term used to describe idealized version of a male, who is very successful at gaining sexual and romantic attention from women. Incels unsuccessfully compete against Chads for attention. |
| **Femoid; Foid; Roastie** | Terms used to dehumanize females. |
| **Just Be First (JBF)** | A phrase used to describe the targeting of minors for sexual advances in order to be their first sexual experience, before their perceived corruption by society, and is "justified" by some as the only chance Incels have to ascend from Incel status. |
| **It's Over** | A comment which describes the hopelessness of being an Incel. The typical response to this comment is "it never began." |
| **LDAR** | Acronym for "Lie Down And Rot," which is perceived as the only option for Incels to cope with their Incel status. |
| **Looksmatching** | A term used to describe the matching of the attractiveness level of both romantic partners, which Incels see as a solution to the perceived problem of unattractive men having no potential partners. |
| **Looksmaxxing** | The process of self-improvement with the intent to become more attractive. |
| **MGTOW** | Acronym for "Men Going Their Own Way," which refers to an online community that has overlap with the Incel community. |
| **NEET** | Acronym for "Not in Education, Employment, or Training," which signifies that a person is truly hopeless. Not used exclusively by Incels. |
| **Normie; Blue Pill** | Derisive terms used to describe "normal people." Not used exclusively by Incels. |
| **Red Pill; Black Pill** | Red pill refers to a belief shared by many online communities that society is corrupt, and that the believer is a victim of this corruption. Black pill, which is specific to Incels, refers to a belief that this corruption can only be changed through massive societal restructuring, often including violence. |
| **Rope** | A reference to committing suicide by hanging. |
| **Stacy** | Idealized version of a female, who is very successful at gaining sexual and romantic attention from men. Chooses Chad over Incels. |

# (U//FOUO) Racially or Ethnically Motivated Violent Extremism (RMVE): Significant Literature and Terminology Guide

## (U//FOUO) Significant Literature





**Mein Kampf – Adolf Hitler**

<u>Significance:</u> Work penned in 1924 by Hitler, in which Hitler describes how he came to be anti-Semitic, and argues for a conception of Jews as inferior and perpetrators of a plot to control the world. Hitler references genocide in the work, as well as his intention—and the need—to create a New Order.

<u>Main Point(s):</u> Anti-Semitism; Need for New Order.



**White Power – George Lincoln Rockwell**

<u>Significance:</u> Published in 1966, the book is the last of six written by Rockwell, a prominent neo-Nazi who founded the American Nazi Party in 1959. The work is highly influential to RMVEs, often required reading for engagement in groups.

<u>Main Point(s):</u> National Socialism; anti-Semitism; white supremacy.



**Turner Diaries – William Pierce (Andrew MacDonald)**

<u>Significance:</u> A 1978 novel describing a fictional, subversive US-based RMVE organization's successful initiative to start a violent revolution and race war leading to the extermination of all non-whites, Jews, and perceived race traitors in the US, told from the perspective of a member of the organization. Highly influential to RMVEs and other DVEs, and has been cited by several attackers and violent plotters.

<u>Main Point(s):</u> Take action; tradecraft; organization/planning necessary; success possible.



**Siege – James Mason**

<u>Significance:</u> Collection of RMVE-themed articles penned by long-time American neo-Nazi, Mason, during the 1980s. *Siege*, and its author, are highly influential to RMVEs, and is required reading for many to join RMVE groups, their affiliated groups or others associated with RMVE subcultures online.

<u>Main Point(s):</u> "Direct action," violence to inspire race war; leaderless resistance.



**Next Leap: An Iron March Anthology – Alexander Slavros**

<u>Significance:</u> 2015 work by Alexander Mukhitdinov (aka, Alexander Slavros). Slavros is a significant figure to many RMVEs as he is identified as the creator of the now defunct Iron March forum, an online forum created in 2011 in which many RMVEs communicated, and from which some prominent RMVE groups such as the now-disbanded Atomwaffen Division were formed. Some RMVEs adopt Slavros' particular brand of "fascism," as outlined in the work.

<u>Main Point(s):</u> Key tenets of new "fascism."

## (U//FOUO) Other Influential Literature

- *A Squire's Trial* – Alexander Slavros
- *American Futurist Manifesto* – Alexander Slavros
- *The Lighting and the Sun* – Savitri Devi
- *88 Precepts, White Genocide Manifesto* – David Lane
- *The Unabomber Manifesto: Industrial Society and its Future* – Theodore Kaczynski
- *Hunter* – William Pierce (Andrew MacDonald)
- *The Brigade* – Harold Covington
- *Leaderless Resistance* – Louis Beam

## (U//FOUO) Influential Attacker Manifestos



**2083: A European Declaration of Independence** – 2011, Anders Breivik: The work is predominantly anti-Muslim, anti-immigration, and anti-feminist.



**The Great Replacement** – 2019, Brenton Tarrant: Mirrors Breivik's manifesto in focus on anti-immigration, anti-Muslim themes; introduces anti-corporatism; environmentalism, eco-fascism; and accelerationism themes.

## (U//FOUO) Other Historical Influential Figures

- Timothy McVeigh
- Richard Butler
- Benhart "Ben" Klassen
- Matthew Hale
- Harold Covington
- Tom Metzger
- Miguel Serrano
- Pentti Linkola
- Julius Evola

(U) Sources: FBI Information and Open Source Information. This document derives from multiple sources of information collected by the FBI.
(U) RMVEs employ a number of tactics, some of which may be criminal and others of which may constitute exercise of rights guaranteed by the First Amendment to the Constitution of the United States. The FBI may not base any investigative activity solely on the rights guaranteed by the First Amendment.
(U) For additional information, please contact the Counterterrorism Analysis Section of the FBI Counterterrorism Division via email FBI_CTAS@ic.fbi.gov.

**(U//FOUO) Glossary of Terms Used by RMVEs**

| | |
|---|---|
| **1488** (also 14 and 88 individually) | Usually refers to the "14 words" coined by deceased RMVE David Lane: "We must secure the existence of our people and a future for White children," or less commonly, "Because the beauty of the White Aryan woman must not perish from the earth." The use of 88 refers to "HH" for "Heil Hitler." |
| **((( )))** | Sometimes called "echoes," RMVEs often use triple parentheses around a name to indicate the person is Jewish or that an institution is under Jewish management. |
| **Accelerationism** | A concept holding that the existing social order should be pushed to such a degree that Western countries become failed states, giving rise to changes that would reshape the world in radical ways. Adherents advocate for acts of social disruption, including violence, and taking violent action to prompt responses that would gain support from those advocating for the superiority of the white race. |
| **Alt Right** | "Alt right," a shortened version of "alternative right," is a loosely associated movement of identitarians, white nationalists, and others who reject traditional conservative politics and advocate for the preservation and protection of the white race and Western civilization. |
| **Based** | RMVEs use the term to refer to someone who has been converted to racist ideology, or as a way of indicating ideological agreement. |
| **Blood and Soil** | A slogan used by the Nazi regime that some RMVEs adopt to assert racial purity and ties to the land. |
| **Day of the Rope** | A reference to the plot of *The Turner Diaries*, specifically a day when 'race traitors' were executed in public hangings. RMVEs often use the term online to threaten or imply violence. |
| **Goys, Goyim** | A Hebrew term used to describe non-Jews, which RMVEs sometimes ironically apply to themselves and fellow RMVEs to set them apart from Jews. |
| **Great Replacement** | First popularized among European nationalists based on a 2005 book of the same title, the term refers to the belief in a conspiracy to replace the white race and Western culture through high non-white birth rates, mass immigration, and other measures. Also the title of the manifesto of the individual who attacked mosques in Christchurch, New Zealand in March 2019. See also, "White Genocide." |
| **Jews Will Not Replace Us You Will Not Replace Us** | Slogans used by RMVEs in response to perceptions that Jewish conspirators or others are plotting to replace white people through high non-white birth rates, mass immigration, and other measures. |
| **LARPing** | A term which stands for "Live Action Role-Playing" originally meant to describe a role-playing game in which participants act out their roles as fictional characters. RMVEs and their associates use the term online to deride individuals accused of not being as extreme, or in possession of skills or other valued characteristics, they claim to have. |
| **/pol/** | Refers to the "politically incorrect" discussion boards on 4chan and 8chan used by some RMVEs to broadcast their violent intentions and RMVE ideology. |
| **RaHoWa** | "Racial Holy War" is a belief in white power circles that whites should take up arms and fight a race war against Jews and non-whites. |
| **Red pill** | In the context of RMVE ideology, taking the red pill or becoming "redpilled" indicates the adoption of racist, anti-Semitic, or fascist beliefs. |
| **Shoah, Shoah'd** | A Hebrew term for the Holocaust. RMVEs sometimes adopt the term to make light of the Holocaust in an anti-Semitic context or to describe the deletion of their social media accounts. |
| **Siege Culture** | A term used to describe the ideological and operational themes advanced by adherents to James Mason's *Siege*. Individuals who adopt these ideas are often said to have been "Siege-pilled." |
| **White Genocide** | Refers to some RMVEs' belief that the white race is in danger of extinction due to forced assimilation engineered by a Jewish conspiracy or brought about by demographic changes, feminism, multiculturalism, interracial relationships, abortion, and other social forces. |
| **Zionist Occupied Government (ZOG)** | Also called "Jewish occupational government" or "JOG," serves as a reference to the belief that a Jewish conspiracy controls the government and manipulates it to counter the interests of the white race, such as through policies to advance "White Genocide." |